# CASES DETERMINED

# August Term, 1901.

## SHAW, Respondent, vs. GILBERT, Appellant.

*April 11 — September 24, 1901.*

*Deceit: Obtaining credit by fraud: Pleading: Insolvency: Corporations: Capital stock not a liability: Reliance on false statements: Due care: Evidence: Court and jury: Instructions: Special verdict: Ambiguity: Purpose of false statements: Materiality: Damages: Value of claim against insolvent corporation: Stockholders' liability: Interest: Partnership: Right of action for tort: Survivorship.*

1. A complaint alleging that plaintiff and another, since deceased, parted with valuable property in ignorant reliance upon false statements of the defendant, known by him to be false, and intended to induce plaintiff to so part with her property, states a cause of action, even though the demand for judgment includes certain elements of damages not recoverable.

2. Upon the question whether or not a person was insolvent, in the sense that his assets did not equal or exceed his debts, evidence of extreme and unusual acts and conduct indicative of financial embarrassment and distress, such as are the customary accompaniments and consequence of insolvency·in fact and are not usual accompaniments of a contrary condition, is admissible as tending, in connection with other more direct evidence, to establish such insolvency; but such evidence should be submitted to the jury with cautionary instructions to consider carefully all circumstances and explanations before drawing an inference of actual inadequacy of assets, at fair and ordinary values, to satisfy the debts.

3. In determining whether or not a corporation is insolvent in the sense above stated, its capital stock should not be considered as a

Shaw vs. Gilbert.

liability, and instructions to the jury upon that point should be without ambiguity.

4. The question being whether plaintiff's firm exercised due care and diligence in the matter of extending credit to a corporation in reliance upon defendant's statements as to its financial condition, a witness, who had been the auditor of the corporation, testified that shortly after the time at which such statements were alleged to have been made he made a full showing of the affairs of the corporation to plaintiff's partner (since deceased), with balance sheet, inventory, etc., and full explanation of the facts. *Held*, that in submitting the case to the jury sufficient significance was not given to that testimony. The question of fact whether the auditor gave such information to plaintiff's firm should have been specifically submitted, either by direct question or by instruction that, if he did plaintiff could not be held to have exercised reasonable care in continuing to rely upon defendant's representations in conflict therewith.

5. Defendant having denied that he ever had any conversations with plaintiff's agent to whom he was alleged to have made the statements in question, the submission to the jury of questions which, in form, assumed that such conversations were had, is *held* confusing, even though accompanied by explanatory instructions; but whether a material error was thus committed is not determined.

6. Where plaintiff's agent testified positively that such conversations were had, the question was one for the jury, even though defendant's positive denial had some corroboration.

7. The inclusion, in a question of a special verdict, of several inquiries capable of answer in different ways is not a material error unless, measured by the answer, it leaves the jury's decision ambiguous and uncertain. Thus, the jury having found, in answer to other questions, that defendant made three several false representations, an affirmative answer to a further question as to whether plaintiff relied upon "such representations," leaves no ambiguity.

8. The answer to such question is equally sufficient to support a judgment whether the reliance was placed on one or on all of the false statements, they being each and all material.

9. A false statement relied on, and without which the transaction resulting in damage would not have been had, constitutes legal deceit, although it may not have been the sole motive or consideration moving the defrauded party thereto; and it is immaterial, therefore, whether or not he also relied on other unactionable statements.

Shaw vs. Gilbert. ·

10. If a false statement as to the financial condition of a corporation was made for the purpose of inducing a creditor to furnish additional materials to it, it is immaterial whether or not such statement was also made in part for the purpose of assuring the creditor that the then existing indebtedness would be paid.

11. In such a case, evidence showing that both parties had in expectation that the creditor was to continue furnishing materials to the corporation, and testimony that one of the assertions made was that such creditor might fill all orders of the corporation and extend its notes with perfect safety, were sufficient to carry to the jury the question of intent to influence the creditor's conduct in respect to future transactions.

12. Statements, made for the purpose of inducing extension of credit to a corporation, to the effect that it was solvent, that it had a large amount of unincumbered assets, and that its business was prosperous and profitable, are all material as matter of law, and should be so held in an action for the deceit.

13. A slight want of ordinary care is inconsistent with the reasonable diligence which, in order to a recovery for deceit, must have been exercised by plaintiff in relying upon the false statements; and refusal to so instruct the jury, when requested, is error.

14. In an action for deceit it was error to refuse to instruct the jury to the effect that the fraud could not be found from conjecture or mere inference but must be clearly proven.

15. A ruling of the court in respect to remarks of counsel, tending to convey to the jury the idea that a party might have offered in evidence letters written by himself containing self-serving declarations, is *held* erroneous.

16. For a deceit whereby plaintiff was induced to sell goods to an insolvent corporation, the price at which the goods were so sold, being shown to be their fair value, was the proper measure of damages, even though an ordinary measure of trade profit was included therein.

17. In such a case the value neither of the accounts for such goods nor of the notes received upon monthly settlements is material, prior to the time when, in accordance with the course of business contemplated by the parties, the plaintiff would be expected to demand and insist upon payment.

18. But the value, if any, of plaintiff's claim against the corporation upon the settlement of its affairs under an assignment for the benefit of creditors, should be deducted from the damages otherwise recoverable; and in estimating such value the liability of responsible stockholders of the corporation for stock issued to them with-

Shaw vs. Gilbert.

out consideration should be considered as an asset of the corpora-
tion, including, in such liability, interest upon the face value of
that stock from the date of its issue.

19. After a partnership consisting of plaintiff and one H. had been in-
duced by deceit to become a creditor of an insolvent corporation,
plaintiff purchased, for full value, all of H.'s interest (being one
sixth) in the firm and its assets, including the claim against the
corporation.    H. died, and thereafter plaintiff brought this action
for the deceit.    *Held,* that after the sale by H. to plaintiff there
existed no joint right of action for the tort, and that plaintiff
could not, therefore, recover, as survivor of two joint sufferers,
the whole damage caused by the deceit, but could recover only
her separate interest (five sixths) therein.    CASSODAY, C. J., dissents.

20. One defrauded of money or valuable property is entitled to recover
not only such money or value but also interest from the date of
the deprivation; and when value and date are found by the jury
the court should apply the law as to interest and not leave the re-
covery thereof to the discretion of the jury.

21. In an action for deceit whereby plaintiff was induced to give credit
to an insolvent, interest on the amount of the loss can be recov-
ered only from the date when, according to the contract and the
customary or contemplated course of dealing, plaintiff was en-
titled to insist on payment from such insolvent.

APPEAL from a judgment of the circuit court for Eau
Claire county: E. W. HELMS, Judge.    *Reversed.*

For more than a year prior to February 1, 1893, the plaint-
iff, *Addie M. Shaw,* in association with George H. Hopper,
under the firm name of N. Shaw & Co., was engaged in a
foundry business at Eau Claire, where was located the Na-
tional Electric Manufacturing Company, engaged in the
manufacture and sale of electrical machinery, dynamos,
generators, and the like, involving the taking of consider-
able contracts for the installation of electric plants.    It was
a corporation which had been organized, partly at least, to
enlarge the business of the city, and many of the more
prominent business men of Eau Claire were among its
stockholders.    The defendant, *Fitch Gilbert,* had been vice-
president until February, 1892, and thereafter had been
president, but not the detail managing officer.    About the

1st of February, 1893, the corporation being then indebted to the plaintiff's firm more than $20,000, and having placed with that firm considerable further orders for the manufacture of castings and the like, the plaintiff claims that her husband, N. Shaw, who was an active participant in the business of N. Shaw & Co., called on the defendant, *Gilbert*, at the office of the company, and demanded of him a statement as to the true condition of its affairs, and, according to the complaint, stated as a reason therefor the size of the indebtedness and peril of ruin to the plaintiff's firm in case of trouble, and because, if anything was wrong, she desired to take measures to collect or secure said debt. Whereupon defendant, as alleged in the complaint, " in answer to said inquiry, and for the purpose of inducing the said N. Shaw & Co. to refrain from attempting to collect said indebtedness, and for the purpose of procuring from the said N. Shaw & Co. a larger credit for the said National Electric Manufacturing Company," made certain false, fraudulent, and deceitful statements, to wit, as testified by Noah Shaw, " that the National Electric Company was perfectly solvent; that their assets were largely in excess of their liabilities; that they had many bonds, notes, contracts, and book accounts, which all belonged to the company and were unincumbered; and that my fears were entirely groundless, and that I might furnish the National Electric Company, fill all orders of the National Electric Company, and extend notes as required by them, with perfect safety; " and that " they were doing a profitable business." Thereupon the plaintiff, relying on such statements and believing them to be true, continued to manufacture and furnish goods for the company, and did also extend the time of payment of the indebtedness theretofore existing. On or about April 29th, Noah Shaw testifies, a further interview was had, in which all of the foregoing statements were repeated verbatim, with the additional one that " we are so well satisfied with our business

that we have increased our capital stock to $500,000, all of which will be paid in full, and we shall then pay cash." Relying upon these statements, plaintiff's firm continued to supply and extend up to May 23, 1893, when the National Company made a voluntary assignment for the benefit of creditors. Between these two conversations goods were supplied of the price of $10,192.50, and between the second conversation and the assignment a further amount of $4,655.14, no part of which had been paid. Meanwhile $12,000 had been paid by the company, but was applied upon the pre-existing indebtedness. On the 25th of May, 1893, the plaintiff bought and received transfer of all Hopper's interest in the firm and its assets for full value, as she alleges. This, of course, included his share of the claim against the National Company for goods sold to it. Hopper died August 1, 1895, before the commencement of this action.

As a result of the trial, the jury found that the defendant did represent to N. Shaw & Co., both about February 1st and about April 29th, that the National Company "were perfectly solvent, that their assets were largely in excess of their liabilities, that they had many bonds, notes, contracts, and book accounts, which all belonged to the company, that the assets were unincumbered, and that the said company was doing a profitable business;" that all of said representations were false; that they were all made by the defendant as affirmations of existing facts, and were so understood by N. Shaw & Co.; that they were all made by the defendant, knowing them to be false, and that defendant then had the means of knowing them to be false; that they were made positively and as of defendant's own knowledge, with the intention of deceiving N. Shaw & Co.; that N. Shaw & Co. were, at the time they were made, ignorant of the falsity of such representations; that they did not have the means of knowing them to be false; that the representa-

tions were made by the defendant for the purpose of in-
ducing N. Shaw & Co. to extend credit (supply goods) to
the National Company; that N. Shaw & Co. believed the
representations to be true, relied upon them, and were
thereby induced to extend additional credit (furnish goods)
to the National Company; that they exercised reasonable
care and diligence in ascertaining the truth of the repre-
sentations, and in extending credit to the National Com-
pany as they did; that they extended credit (furnished
goods) to the amounts above stated, and that N. Shaw &
Co. would not have extended such credit if such false rep-
resentations had not been made; that the value of plaintiff's
account against the Electric Manufacturing Company for
the materials and labor furnished after February 1, 1893,
as above found, was nothing at the date of the assignment,
May 23, 1893, and it had no value at any time subsequent.

Upon the coming in of this verdict, motions for new trial
and for judgment notwithstanding the verdict were over-
ruled, the court signing an order to that effect, and filing a
written decision containing the statement: "Interest will
be allowed under the doctrine of *Arpin v. Burch*, 68 Wis.
619. . . . Plaintiff's attorneys may prepare judgment
in accordance with the above memorandum, and overruling
the defendant's motion for judgment and for new trial."
Thereupon the clerk entered judgment in plaintiff's favor
for the aggregate of the two sums found by the verdict, to-
gether with interest thereon from May 23, 1893, from which
judgment defendant appeals.

For the appellant there were briefs by *Frawley, Bundy
& Wilcox*, attorneys, and *Losey, Woodward & Lees*, of coun-
sel, and oral argument by *C. T. Bundy* and *G. M. Wood-
ward*. They contended, *inter alia*, that the measure of
damages in this case is the difference between the actual
value of the goods plaintiff sold, *at the time of the sale*, and
the actual value of each month's current account, *at the time*

*the same became due*, with interest on such difference in the discretion of the jury. 14 Am. & Eng. Ency. of Law (2d ed.), 188; Sutherland, Damages (2d ed.), § 1171; *Peek v. Derry*, 37 Ch. Div. 541; 21 Am. & Eng. Corp. Cas. 243; *Baker v. Ashe*, 80 Tex. 356; *Van Epps v. Harrison*, 5 Hill, 62; *May v. Dyer*, 57 Ark. 441; *Hubbard v. Briggs*, 31 N. Y. 518; *Hubbell v. Meigs*, 50 N. Y. 480; *Vail v. Reynolds*, 118 N. Y. 297; *Townsend v. Felthousen*, 156 N. Y. 618; *Nash v. Minnesota T. I. & T. Co.* 163 Mass. 574; *Smith v. Bolles*, 132 U. S. 125; *Redding v. Godwin*, 44 Minn. 355; *Reynolds v. Franklin*, 47 Minn. 145; *Wallace v. Hollowell*, 56 Minn. 501; *American Nat. Bank v. Hammond*, 25 Colo. 367; *Whiting v. Price*, 172 Mass. 240; *Emmerson v. Dardanelle Bank*, 52 S. W. Rep. 274; *High v. Berret*, 148 Pa. St. 261; *Rockefeller v. Merritt*, 35 L. R. A. 639; *Birdsey v. Butterfield*, 34 Wis. 52; *Foster v. Taggart*, 54 Wis. 391; *Warner v. Benjamin*, 89 Wis. 290; *John V. Farwell Co. v. Wolf*, 96 Wis. 10; *Pieratt v. Young*, 49 S. W. Rep. 964; *Potter v. Necedah L. Co.* 105 Wis. 25. Depreciation of property which one has been induced to acquire by means of fraudulent representations cannot be taken into consideration as an element of damage. 14 Am. & Eng. Ency. of Law (2d ed.), 189; *Redding v. Godwin*, 44 Minn. 355; *Hubbell v. Meigs*, 50 N. Y. 481; *Brisbane v. Pomeroy*, 13 Daly, 358; *Marvin v. Prentice*, 94 N. Y. 295. The materiality of the alleged representations was for the jury. 14 Am. & Eng. Ency. of Law (2d ed.), 207; *Westbury v. Aberdein*, 2 Mees. & W. 267; *Lindenau v. Desborough*, 15 Eng. C. L. 306; *Phenix Ins. Co. v. Fulton*, 80 Ga. 224; *Sharp v. Ponce*, 74 Me. 470; *McAleer v. Horsey*, 35 Md. 439; *Moore v. Cains*, 116 Mass. 396; *Davis v. Davis*, 97 Mich. 419; *Bidault v. Wales*, 20 Mo. 546, 64 Am. Dec. 205; *Keller v. Niagara F. Ins. Co.* 16 Wis. 523. In cases of this character interest is a proper element of damage *in the discretion of the jury*, but the court must not award it. 3 Sutherland, Damages (2d ed.), § 1171; *Walrath v. Redfield*, 18 N. Y.

457; *Lincoln v. Claflin,* 7 Wall. 135; *Eddy v. Lafayette,* 49 Fed. Rep. 813; *Glaspell v. N. P. R. Co.* 43 Fed. Rep. 900; *Hallum v. Dickinson,* 47 Ark. 120; *Hinckley v. Beckwith,* 13 Wis. 37.

For the respondent there was a brief by *F. M. Miner,* attorney, and *Olin & Butler,* of counsel, and oral argument by *Mr. Miner, Mr. J. M. Olin,* and *Mr. H. L. Butler.* They argued, among other things, that, as tending to show insolvency in the sense of insufficiency of assets to pay liabilities, as well as to show the unprofitable character of the business, evidence was proper that the company had difficulty in meeting its obligations as they matured, that its bills were constantly discounted, that its assets were hypothecated as fast as acquired, that the company had no credit of its own, that its stock was unsalable, and other evidence of like character. Abbott, Trial Ev. (2d ed.), 777, § 5; *Jeffris v. Fitchburg R. Co.* 93 Wis. 250; *Rowe v. Leuthold,* 101 Wis. 242; *Clarke v. Mott,* 33 Pac. Rep. 884; *Mensing v. Atchison,* 26 S. W. Rep. 509; *Baily v. Hornthal,* 154 N. Y. 648, 656; *Tuthill v. Skidmore,* 124 N. Y. 148, 153; *Brown v. Montgomery,* 20 N. Y. 287; *Booth v. Powers,* 56 N. Y. 22, 32; *Pacific P. T. C. Co. v. Fleischner,* 66 Fed. Rep. 899, 905; *Lowry B. Co. v. Empire L. Co.* 91 Ga. 624; *Millard's Appeal,* 62 Conn. 184; *Oakley v. Paterson Bank,* 2 N. J. Eq. 173; *Larkin v. Hapgood,* 56 Vt. 597. Plaintiff is entitled to the entire damages. Hopper's interest in the cause of action in favor of the firm against this defendant could not pass to plaintiff by the assignment made. The injury complained of was done to the firm. The cause of action was therefore a joint cause of action in favor of the firm. This is true notwithstanding the partnership was dissolved before Hopper's death. Whether the relation of partnership, strictly speaking, continued as to the cause of action after the dissolution, is immaterial. The right of action must still have been prosecuted jointly, and would still remain a

joint cause of action in favor of both. Where any cause of action, though sounding in tort, existed in favor of two or more jointly, so that they might join in its enforcement, it survived at the common law on the death of one to the others. A distinction was made between survival of a cause of action in favor of the *representative* of the *sole* owner thereof, and survival in favor of the *survivor* of a deceased co-owner. *Wright v. Eldred*, 2 D. Chipman, 37; *Haven v. Brown*, 7 Me. 421; *Boynton v. Rees*, 9 Pick. 528; *Rowe v. Shenandoah P. Co.* 42 W. Va. 551; *Bond v. Hilton*, 6 Jones, Law, 180; *Taylor v. Church*, 9 How. Pr. 190; *Bohm v. Dunphy*, 1 Mont. 333, 341; *Atlanta v. Dooly*, 74 Ga. 702, 708; *Tucker v. P. & W. R. Co.* 18 R. I. 322; *Scoble v. Tolye*, Style, 102; *Spring v. Barret*, 2 Bulst. 262; *Farr v. Trustees A. O. U. W.* 83 Wis. 446; Freeman, Cotenancy, § 362; Dicey, Parties (2d Am. ed.), 402; 14 Viner, Abr. 473. The proposition that plaintiff was properly allowed the entire damage is, moreover, sustained by the rules which govern the relation of partners. The cause of action accrued to the partnership. When the dissolution occurred, there still remained outstanding firm liabilities to a large amount, due to the bank, and such liabilities are still unpaid. The parties remained partners in the cause of action, notwithstanding the dissolution, until the death of Hopper, when the legal title to the entire cause of action vested in plaintiff as his survivor. 1 Bates, Partnership, § 684; Dicey, Parties (2d Am. ed.), 386; *Shields v. Fuller*, 4 Wis. 102; *Yale v. Eames*, 1 Met. 486; *Murray v. Mumford*, 6 Cow. 441; *Shale v. Schantz*, 35 Hun, 622.

The following opinion was filed May 21, 1901:

DODGE, J. The appellant's brief presents and argues some seventy specific allegations of error. In many cases they are merely variant aspects of the same question, and in the effort to avoid undue prolixity we shall attempt to

discuss the questions raised, rather than the individual as-
signments.

1. An objection in the nature of a demurrer *ore tenus*
was overruled.   In this we find no error; for, while by the
complaint were demanded elements of damage not recover-
able, some cause of action was set forth.   It was, at least,
alleged that plaintiff and another, since deceased, parted
with valuable property in ignorant reliance upon false
statements of the defendant, known by him to be false, and
intended to induce plaintiff to so part with her property.
This was sufficient to sustain a cause of action.

2. The next subject for consideration arises upon some
six or seven assignments of error raising the questions
whether a certain class of evidence either tended or sufficed
to establish insolvency of the National Electric Company
at the times of the alleged misrepresentations.   This evi-
dence consisted of a vast array of transactions and corre-
spondence indicating extreme pecuniary stringency and
distress, defaults in payments when due, solicitation of
extensions, overdrawn bank account, hypothecation of
manufacturing contracts even before the machines had
approached completion, and a multitude of other circum-
stances and instances extending through more than a year
prior to the misrepresentations.   No direct evidence was
introduced showing the amount of either the assets or the
debts of the company.   The appellant correctly contends
that none of these circumstances nor all of them constitute
insolvency, but that, to show falsity of defendant's state-
ment that the company was solvent, the fact must be made
to appear that the assets, at a fair valuation, were not suf-
ficient to satisfy its liabilities other than capital stock.
*Hamilton v. Menominee Falls Q. Co.* 106 Wis. 352.

The respondent's counsel contends that, by the nature of
things, he was cut off from presenting the best evidence,
namely, the books and schedules of the corporation itself,

they not being competent against this defendant, and that evidence of its dealings was the next best. This position is hardly tenable. The question, "What assets and what liabilities had the corporation?" was capable of direct answer by the testimony of those who knew, such as the officers and employees. They, except defendant himself, were disinterested, and might have been called to the stand. Incompleteness of their memories from lapse of time might impair the strength of plaintiff's case, but the delay was her own and should not excuse her from proving her case by legal evidence or render admissible any other. We therefore must confront the question whether evidence of embarrassment, financial distress, and the like can generally be received as tending to prove the ultimate fact of insolvency in the sense above stated, i. e. preponderance of debts over assets fairly valued. Respondent cites numerous cases where such evidence is held both admissible and sufficient to prove insolvency, but in the great majority of those cases the term was used in a different sense, well recognized as its legal meaning in certain relations, to wit, as merely inability to meet debts as they mature in the ordinary course of business. *Jeffris v. Fitchburg R. Co.* 93 Wis. 250, is an illustration of this class. When that condition is all that need be proved, dishonor of commercial paper and like defaults not only tend to prove insolvency, they actually constitute acts of insolvency if unexplained.

Nevertheless, there is authority as well as reason in support of the view that extreme and unusual acts and conduct, such as are the customary accompaniments and consequence of insolvency in fact and are not usual accompaniments of a contrary condition, may be admitted to consideration as circumstances tending, in connection with other more direct evidence, to establish the fact that assets do not equal or exceed the debts. Abbott, Tr. Ev. (2d ed.), 777; *Jordan v. Osgood,* 109 Mass. 457; *Booth v. Powers,* 56 N. Y. 22, 32;

*Mensing v. Atchison* (Tex. Civ. App.), 26 S. W. Rep. 509.
We conclude in favor of that rule, and accordingly hold
that error is not well assigned upon the admission of this
class of evidence, nor in permitting the jury to consider it
upon the truth of the representation of solvency.   There
are perhaps items of evidence or testimony among those
criticised by appellant which are not relevant upon that
issue, but were relevant to the question of the extent of de-
fendant's knowledge of the truth or falsity of that or the
other representations charged against him, and of his knowl-
edge of the usual course of business between plaintiff and the
company, or by way of cross-examination of witnesses who
had testified inconsistently with them.   We do not deem it
necessary to discuss the admissibility of each item of evi-
dence, but merely pass upon it generically.

In this connection, it is natural to note appellant's conten-
tion that the evidence was not sufficient to sustain a finding
of insolvency, as the term is above defined, merely to say,
however, that we deem the question doubtful. . Although
the evidence of distress and the resort to extreme shifts
and expedients for raising money may have been admissible,
the conclusion of insolvency should be drawn therefrom, if at
all, only with much hesitancy.   Embarrassment, accom-
panied by extensions and other expedients, is not unusual
with manufacturing concerns having abundant assets.  Prop-
erty is not money, and is not available to pay debts or
wages, nor always as a basis of credit upon which to bor-
row.   It must not be forgotten that a part of the period in-
volved in the transaction was that preliminary to, and in
part inclusive of, the now historical panic of 1893, when men
and corporations of abundant wealth were driven to extraor-
dinary shifts to raise trifling sums of money, when credit
almost ceased, and rates of interest rose to fabulous height,
so that conduct ordinarily inconsistent with solvency be-
came insignificant on that subject.   The evidence should,

in any event, be weighed with care and submitted' to the jury with cautionary instructions to consider carefully all circumstances and explanations before drawing an inference of actual inadequacy of assets, at fair and ordinary values, to satisfy the debts of the National Company.

Appellant further asserts that the case was tried throughout and submitted to the jury on the assumption, by both attorneys and court, that solvency could not exist unless the assets, reasonably valued, exceeded all liabilities, inclusive of the par value of outstanding capital stock,— a proposition repudiated by this court in *Hamilton v. Menominee Falls Q. Co.* 106 Wis. 352, which had not been decided at the time of the trial below,— and that the answer of the jury finding the representation of solvency to be false is predicated upon that view. There are many things in the record not inconsistent with appellant's assertion. In the examination of witnesses by plaintiff's attorney, that construction of the word is repeatedly insisted on. Defendant's attorney had present in court, and referred to for certain purposes, a balance sheet of January 1, 1893, showing the assets to exceed debts by something like $180,000, but to be a trifle less than the total liabilities if outstanding stock were included, which, however, he refrained from introducing in evidence in such a way that it could be used upon the question of solvency. The instruction on the subject is consistent with either view. That instruction on the subject of insolvency was as follows: "A person is insolvent when his assets, at a fair market value, are not sufficient to pay his liabilities. You are instructed that the National Electric Manufacturing Company was not insolvent on the 1st day of February, 1893, or on the 20th day of April, 1893, if at such times its assets, at a fair market value, were worth more in the aggregate than its whole liabilities." Obviously the jury may have understood the words, "whole liabilities," to include or exclude capital

stock. Had an instruction making this phrase definite been requested and refused, we think it would have been error, but no such request was made. The instruction is not erroneous if the word "liabilities" is understood in its true and legal sense, as defined in *Hamilton v. Menominee Falls Q. Co., supra*, and it may be that we cannot properly infer that it was either used by the court or understood by the jury in an erroneous sense. We shall not, therefore, predicate reversal upon any such error, but take this occasion to reassert the doctrine on this subject of *Hamilton v. Menominee Falls Q. Co.*, and to express the expectation that upon another trial the court's attitude will be without ambiguity, and the jury clearly instructed.

3. One William E. Smith, who was auditor of the National Company during the periods involved in this case, testified that shortly after February 1st he had an extended interview and conversation with Mr. Hopper, of the firm of N. Shaw & Co., in which he went fully into the affairs of the company, and exhibited to Mr. Hopper the balance sheet of resources and liabilities of date January 1, 1893, whereby it appeared that about $110,000 of the company's indebtedness was secured by collaterals, which, Smith explained, meant that accounts, bills receivable, and contracts had been pledged to stockholders for advances of that amount of money to the company. It also appeared by such balance sheet that the net losses of the company in 1891 and 1892 had been about $15,000, and that to such extent its resources were less than its liabilities, including capital stock. By accompanying inventory, also exhibited, it appeared that in those resources were included such items of doubtful sale value as patterns, over $7,000; advertising matter, $1,700; patent account, over $10,000; and experiment and exploitation account, over $10,000. Smith also testified that the examination was not cursory, but item by item, and with explanation by him of the facts. Hopper being dead, there

was no direct contradiction of this testimony, though plaintiff claimed that it was antagonized by many considerations of improbability. Appellant contends that from this conversation it conclusively appears that N. Shaw & Co. were fully informed of the facts as to the solvency or otherwise of the National Company, as to the fact that its available credit assets were in large degree hypothecated, and as to the true extent to which business was profitable, and that thereafter the plaintiff's firm could not, in the exercise of reasonable care, as matter of law, rely upon any statements to the contrary which had been made by the defendant. Appellant requested direction of a verdict on this ground; also the submission of a question whether N. Shaw & Co, received the information so testified to; also whether such information was sufficient to set a prudent man on inquiry; and as to what amount of goods were sold between the representations by *Gilbert* and the conversation with Smith. He also asked instruction that the jury should consider Smith's testimony in determining on due diligence, and that such information, if given, terminated any right to rely on the defendant's representations. He excepted to the instructions in fact given, because they permitted the jury to find Shaw & Co. to have been ignorant and to have exercised reasonable diligence, although Smith's undisputed testimony showed the contrary; and he also moved for a new trial because this testimony negatived, without dispute, any possibility of reasonable diligence on the part of plaintiff's firm.

Without assuming to decide, adversely to the view of the trial court, that Smith's testimony was so without conflict, either of testimony or of probabilities, that the court ought to have proceeded upon the assumption that the interview testified to by him took place and that all the information described by him was in fact disclosed, it appears to us entirely clear that not enough significance was given to that testimony in the submission of the case. If Noah Shaw

& Co. did receive this information within a few days after *Gilbert's* representations to them, they certainly had no further right to rely blindly on statements in conflict therewith. That they did continue to rely without further investigations is distinctly testified to by Mr. Shaw. The court went no further than to submit to the jury the question whether the plaintiff's firm exercised due care and diligence in ascertaining the truth of *Gilbert's* statements and in extending credit, and to instruct them, in substance, that by reasonable care and diligence is meant the care which ordinarily prudent men would exercise under the same circumstances; that, if they knew the representations were false, they had no right to rely upon them nor extend credit; and if they had notice of actual facts, concerning which representations were made, or had knowledge of facts which, by use of reasonable diligence, would have led to the discovery of the truth of the representations, and failed to use such diligence, they must answer, "No;" and that they were to take into consideration all the facts and circumstances proven bearing upon the same, and all the knowledge, from whatever source it came, that was brought home, either to Noah Shaw or George W. Hopper, bearing upon the truth or falsity of any of the representations. The question of fact whether Smith gave the information, as he testifies, should have been specifically submitted to the jury in some way, either by direct question or by instruction that, if he did, the plaintiff could not be held to have exercised reasonable care in continuing to rely on *Gilbert's* representations in conflict therewith. No equivalent for such submission or instruction can be found in the charge. Under the rule of *Warner v. Benjamin,* 89 Wis. 290, 295, error was thus committed clearly prejudicial to defendant, from which reversal must result.

4. We are in some doubt whether the most fundamental question of all, namely, the making of any representations

whatever, was not so confused by the manner of its submission that the jury did not squarely pass upon it. The dispute in the evidence was not whether certain things were said in the two alleged conversations between Noah Shaw and *Gilbert*, but whether any conversations were in fact had. Noah Shaw testified that they were; *Gilbert* testified, with equal positiveness, that they were not, and was supported inferentially by men in the company's office, who denied ever seeing Shaw there at or near the times specified by him. As to what was said if the interviews occurred, Shaw's testimony stood alone and uncontradicted, except by what appellant urges as inherent probability. The trial court submitted the issue by the first and twenty-sixth questions: "Did the defendant at the time of the first [and second] conversation represent to N. Shaw & Co. that," etc.? True, the court instructed the jury: "We have spoken of certain conversations as the first and second conversations. We have done that for the sake of brevity. When we say 'first conversation,'— when I instruct you or read from the questions in regard to the first conversation,— I refer to that conversation, if any was held, which plaintiff [*sic*] testified that he had with the defendant about the first of February, 1893." This is confusing. It falls far short of fastening the minds of the jury upon the square issue of fact to be decided, and hardly suffices to overcome the vice of the question itself, which relates to the matter of a conversation, and not to its occurrence. The minds of the jury are not turned from consideration of what was said as the important thing to consideration of whether the interview took place. We cannot, perhaps, say either that the question was strictly erroneous, or that the jury have not, by answering it, found as a fact that a conversation was had, as well as that certain things were there said. Our conclusion upon the whole case renders it not necessary to decide whether reversible error was thus committed, and we may pass the subject with the

foregoing expression of doubt, and with the expectation that upon another trial the real issue will be clearly submitted.

In this connection it is perhaps most natural to say that we cannot concur in the view advanced by appellant, under other assignments of error, that the evidence was not sufficient to support a finding that the representations complained of were made. Noah Shaw testified thereto positively, and *Gilbert*, with equal positiveness, made denial. This, we think, makes a jury issue, notwithstanding certain circumstances which, appellant argues, render Shaw's testimony incredible. Such evidence consists of the testimony of employees of the National Company that they never saw him enter the office, and of his own testimony that he never at any other time had any transactions on behalf of Shaw & Co. with the National Company or with *Gilbert*. This evidence, however, goes no further than to create a conflict and present a question, the jury's answer to which, either way, has support.

5. Another assignment of error is predicated upon a contention that certain questions were duplex or compound. Of these, question 21 is typical. That question, referring to questions 1, 2, 3, and 4, whereby it was found that three representations were made, all of which were false, inquired, "Did N. Shaw & Co. rely upon such representations so found by you to have been falsely made, and were they induced thereby to extend additional credit to the National Electric Manufacturing Company?" That question was answered in the affirmative. No prejudicial duplicity exists in this question, in view of the answer thereto. Appellant's argument seems to be based upon the understanding that the inclusion in a question of the special verdict of several inquiries, capable of answer in different ways, is necessarily erroneous and prejudicial. This is not true. Such question is materially erroneous only when, measured by its answer, it leaves the decision of the jury ambiguous and uncertain.

Shaw vs. Gilbert.

If a jury be asked whether three separate propositions be true, all joined by the conjunctive, and answer in the affirmative, there is no uncertainty or ambiguity as to any one of them. By declaring that all are true, they have declared that each is. The same question, answered in the negative, might constitute reversible error, if more than one proposition submitted were material; for then the jury, by answering in the negative to the inquiry whether all are true, have not necessarily declared their decision as to any one of them. Such was the vice fatal in *Dugal v. Chippewa Falls*, 101 Wis. 533. That vice, if it existed in the question now under consideration, was cured by the affirmative answer, unambiguously declaring that the plaintiff did rely upon the representations found to be false, and also did extend credit by reason thereof.

Still another consideration disposes of this assignment of error, namely, that the answer to this question is equally sufficient to support a judgment whether the reliance were placed on one or on all of the false misrepresentations, since, as hereafter pointed out, they are each and all material. Such was the ground of overruling a similar assignment in *Patry v. C., St. P., M. & O. R. Co.* 82 Wis. 408, where the question was whether either conductor or brakeman of a defendant railway company invited plaintiff upon the train. It was wholly unnecessary that the jury should define which, for the invitation by either was sufficient to establish the liability.

6. Another class of the assignments of error are predicated on the contention that the three representations included in the special verdict were not the only ones made, but that in the first conversation it was represented that the plaintiff would be safe in filling future orders, and in the second conversation that the stock of the company would be increased to $500,000, and that it would thereafter pay cash for everything. The argument is that these rep-

resentations were not actionable, and that if plaintiff relied thereon her action cannot be maintained. The court refused to inquire whether plaintiff did rely on these statements or would have sold without them. Noah Shaw testified that he relied on all the representations made to him. The jury have found, in reply to another question, that the plaintiff's firm did rely on the representations specified in the first question, and found to be false. This is, of course, sufficient. A false statement relied on, and without which the transaction would not have been had, constitutes legal deceit, although it may not have been the sole and only motive or consideration moving the defrauded party thereto. Doubtless, if it had appeared that plaintiff relied solely on the assertion of the defendant's opinion that she would be entirely safe in ·filling future orders, she could not maintain a recovery although other false statements had been made, upon which she did not rely; but the jury have negatived any such contention. The submission of the question whether she also relied on other unactionable statements or assertions would have been wholly immaterial. 14 Am. & Eng. Ency. of Law (2d ed.), 61, note 5; *Safford v. Grout*, 120 Mass. 20; *McAleer v. Horsey*, 35 Md. 439, 453; *James v. Hodsden*, 47 Vt. 127, 137; *Warner v. Benjamin*, 89 Wis. 290.

7. Appellant requested submission of question whether the representations assigned were made for the purpose of assuring plaintiff that the then existing indebtedness due from the National Company would be paid, and the court refused. The question in fact submitted was whether the representations were made by the defendant for the purpose of inducing N. Shaw & Co. to extend credit to the National Company, and the jury were instructed, in effect, that the words " extend credit " meant to furnish additional materials and perform additional work. This they answered in the affirmative, after being instructed that they could not so answer if defendant's *only* purpose was to as-

sure plaintiff that the then existing indebtedness would be paid. In this respect we are satisfied no error was committed. It would be immaterial that defendant might have intended to assure plaintiff of the safety of her existing indebtedness, if he also intended to induce further extension of credit. That he did intend the latter, and that the former was not his sole purpose, has been distinctly found by the jury, under apt and proper instructions.

8. Another of the assignments of error, closely connected with the foregoing, is the refusal to instruct the jury that there was no evidence upon which they could find that the representations were made for the purpose of inducing the subsequent furnishing of materials or work for the National Company. The evidence of the plaintiff with reference to that conversation, as well as the evidence of the situation generally, shows that both parties had in expectation that plaintiff was to continue furnishing castings for the National Company, and one of the assertions claimed to have been made by the defendant was that plaintiff might "fill all orders of the National Electric Company, and extend notes as required by them, with perfect safety." This certainly was sufficient to carry to the jury the question of defendant's intent to influence plaintiff's conduct in respect to future transactions.

9. Another series of assignments of error are based upon the contention, first, that the jury nowhere found that any of the misrepresentations were material, although they did find that they were intended to be relied on and were relied on. It is also insisted that, if the representation of solvency were in fact true, the representations that the business was profitable, and that the assets were unincumbered, were, as matter of law, immaterial, and the jury should have been so instructed and directed to so find. We do not consider any of these assignments of error well taken; for it seems apparent that all of the three principal representations — solv-

ency, large amount and unincumbered condition of assets, and profitable condition of business — were material as matter of law. Solvency is substantially conceded by appellant's counsel to be so material, but solvency, as already defined, is not inconsistent with failure to pay indebtedness at the time it is due, nor even with inability to enforce payment at any time. Though solvent, in the sense that at the time under consideration a debtor's assets, at fair value, exceed the amount of his liabilities, it is by no means impossible that there may be such pecuniary stringency as to make payment inconvenient, if not well-nigh impossible, at the time the debt falls due; or that the property may have been pledged as security, so that in the enforcement of the debts for which it is pledged the margin of excess may be wasted and destroyed, certainly so that it cannot be made available in money to meet other debts. In considering the safety of extending credit to one in active manufacturing or mercantile business, few circumstances are of equal cogency with that of the existence of large amounts of available assets, such as can be readily reduced to money, made the basis on which to borrow, or may even be acceptable to the creditor in payment. Most notable among these are good accounts and bills receivable. If these be in hand in large amount, a prospective dealer may well take the chances of securing payment of his claim as against other creditors, by reason of his willingness to accept certain of those assets in payment, or by reason of his belief that he can readily find an investor willing to loan enough money upon such security to enable his debtor to satisfy him.

Hardly less material to the quality of a contemplated line of credit is the fact that the debtor's business is prosperous. Solvency in an unprofitable business may quickly become insolvency by the very necessity of realizing upon assets to meet pressing debts. But if the business is profitable the probabilities of such a contingency are greatly lessened. A

careful credit man may justly consider that the solvency of his debtor is then increasing instead of likely to decrease. While materiality of the facts represented is essential to maintenance of an action of deceit (*McAleer v. Horsey*, 35 Md. 439), yet such materiality may be so plain that the court should decide it as matter of law, as we have recently declared in *McGowan v. Supreme Court I. O. F.* 107 Wis. 462.

10. The appellant requested the court to submit to the jury, both by a separate question and by instruction, the proposition that a slight want of ordinary care was inconsistent with the reasonable diligence necessary to a recovery in reliance upon the statements claimed to have been made by the defendant. It is unnecessary at this time to review the considerations which have led this court to hold that, since any want of ordinary care constitutes negligence, a party is entitled to have submitted to the jury, either by question or by express instruction, whether there has been even a slight want of ordinary care. The rule requiring such submission may be thought to smack of overrefinement, but it has been adopted and adhered to so fully that its propriety is now beyond discussion. *Jung v. Stevens Point*, 74 Wis. 547. The plaintiff in this case owed the duty of all the care and diligence which would ordinarily be exercised by an ordinarily diligent and prudent person under like circumstances. If at any stage of the transactions she was guilty of any omission of such diligence or care, however slight, she would not be entitled to recover damages thereby caused. The rule, having been requested so as to fully call the court's attention to it, should have been either given or submitted to the jury, and refusal thereof was error.

11. Appellant requested instruction: "(14) You are instructed that you cannot find that the defendant falsely or fraudulently made representations to N. Shaw & Co. from conjecture or mere inference. Fraud must be clearly proven, and the burden of proof is on the plaintiff to establish that

fact." We think this instruction, or an equivalent, should have been given, and that its refusal is distinct and reversible error. The rule is general and elementary that while fraud, and especially the intent, may be inferred from acts, conduct, and circumstances, yet, as the assertion of fraud involves a charge of moral turpitude, such inference is not to be lightly drawn from doubtful and ambiguous circumstances, nor because of mere suspicion or conjecture. The field of inference is a dangerous one, because the most innocent circumstances can, by juxtaposition with others as presented by counsel, often be colored with suspicion, which, aided by sympathy for the suffering victim of alleged deceit, may often hurry the jury across the line between mere conjecture and legitimate inference, unless restrained by cautionary instructions to sane and careful watchfulness over their mental steps. Juries should always be instructed that they cannot draw an inference of fraud except upon *clear and satisfactory* evidence legitimately pointing thereto. 1 Jones, Ev. § 190.

12. An error is assigned to remarks of counsel and the court thereon, which, while not very definite, seem to include an erroneous idea to which it may be well to call attention. Plaintiff's counsel was commenting upon a voluminous array of letters written by the defendant, claimed by the plaintiff's attorney to constitute evidence, by way of admissions, at once of the insolvency of the company and of *Mr. Gilbert's* knowledge of the fact. He thereupon made the assertion that, if there was any letter there that was favorable to *Mr. Gilbert*, defendant would have put it in. This was objected to, and the court asked to rule that it was improper and that defendant could not, as matter of law, put in a letter that was written by him to somebody else; to which the court ruled: "I am inclined to think that as the matter stands before the court, that other letters in his favor would have been admissible." No rule of law

Shaw vs. Gilbert.

is more elementary than that a party cannot offer in evidence his own self-serving declarations or statements. This ruling would certainly tend to convey to the jury the contrary idea, namely, that if *Mr. Gilbert* had ever written a letter, either denying the company's insolvency or denying his own knowledge thereof, it would have been received in evidence; hence that he never had written such a letter. If this is its fair meaning, it was erroneous and prejudicial.

13. Appellant assigns three separate errors, the substance of which is a complaint that the court allowed the jury to find, and adopt as the measure of plaintiff's damage, the price of the goods sold to the company subsequent to the two representations, in which price there was a margin of profit to the plaintiff of from five to ten per cent. In this there was no error. Plaintiff was entitled to recover as damages the value of the goods parted with on the faith of the misrepresentations, and the evidence is undisputed that the price at which they were sold was the fair value. The fact that in this value was an ordinary measure of trade profit does not interfere with the application of the above rule, any more than as if one purchased by fraud from an ordinary retail dealer the goods upon his shelves at the price at which they were customarily sold in the community. *John V. Farwell Co. v. Wolf*, 96 Wis. 10, 20.

14. Two of the most strenuously argued assignments of error are predicated upon refusal of the court either to decide in defendant's favor or to submit to the jury the question of the value, prior to the company's failure, of the accounts owing by the National Company to plaintiff's firm for goods sold after February 1, 1893, or of the three notes received for such accounts at the end of February, March, or April. We are unable to perceive any error in refusing the specific requests made. The value neither of the open accounts at the end of each month, nor of the notes given in settlement thereof, was of any materiality, so long as

Shaw vs. Gilbert.

plaintiff had no opportunity to realize thereon in accordance with the course of business contemplated by plaintiff and defendant at the time of the misrepresentations. . In the purchase of some commodity, either to be consumed or to be resold, it may well be that the safest measure of damage to the defrauded purchaser is the difference between the actual money value of the commodity at the time of its receipt and its value if as represented. Such rule has been applied in a multitude of cases relating to a variety of commodities, including stocks and perhaps bonds, where of a merchantable character, so that a sale, instead of collection, would be the ordinary process of realizing on them. In case of commodities presumably purchased for resale, the subsequent rise or fall is at the risk of the purchaser, and does not enter into consideration of his damages, except under peculiar circumstances. A few of the many illustrations of the foregoing rules of damage may be cited: *Birdsey v. Butterfield*, 34 Wis. 52; *Warner v. Benjamin*, 89 Wis. 290, 295; *Krause v. Busacker*, 105 Wis. 350, 355; Sutherland, Damages (2d ed.), § 1171; *Vail v. Reynolds*, 118 N. Y. 297; *Smith v. Bolles*, 132 U. S. 125. Obviously, however, where the result of deceit is to foist upon a party a claim for a sum of money, the same principles must be applied in a different manner in order to correctly measure the damage. If he ultimately receives the full amount of his claim, he suffers no damage and can recover none, although that results from subsequent appreciation of security or subsequently attained solvency of the debtor. *Foster v. Taggart*, 54 Wis. 391; *Potter v. Necedah L. Co.* 105 Wis. 25. The worthlessness of the claim at the time of its acquisition would not fix the measure of a defendant's liability, and the converse ought not to, unless ultimate failure of collection results from negligence or from conduct not fairly within the contemplation of the parties or the ordinary and natural course of events. *Baker*

*v. Ashe,* 80 Tex. 356; *James v. Hodsden,* 47 Vt. 128, 138; *Coffing v. Dodge,* 167 Mass. 231; *Smith v. Duffy,* 57 N. J. Law, 679. The situation disclosed at the time of the misrepresentations wholly negatived the idea that plaintiff was to do otherwise than seek collection according to their established custom of dealing, whether of the account at the end of each month, or of any note received in extension thereof, such extension having been customary. It was not contemplated that she was to expose upon the market for sale, at such price as she could obtain, either such accounts or notes. Such conduct would very quickly transpose embarrassment of the company into insolvency and failure. The value of accounts or notes is of no materiality prior to the time when, according to the contemplation of the parties, the plaintiff would be expected to demand and insist upon payment. This time did not occur at the end of each month; for settlement and extension by note of the monthly account was the custom. No evidence exists whether any of the notes taken were for longer time than the previous course of business warranted, and no proof is made of any unusual conduct in the way of extending or renewing such notes, or omission of any efforts to collect when due which defendant had a right to expect. Without such showing no error was committed in refusing to submit the question demanded.

15. An error seems to us well assigned in connection with the recognition as an asset of the liability of certain stockholders for the face of some $48,000 of so-called "dividend stock" issued without anything paid therefor. It was shown with substantial conclusiveness that the other assets had at least sufficed to discharge the expenses of settling the estate of the company; that some $42,000 of this stock was issued to, and held by, responsible holders; and that plaintiff's claim constituted about one fifteenth of the total debts, so that her share of the $42,000 would approximate $2,600.

Plaintiff's attorney, in argument, substantially consented that the jury estimate her probable recovery out of this asset at ten per cent. of her claim. The court instructed the jury, in substance, that this liability was established and plaintiff's right to share therein conceded. Notwithstanding all this, the jury found that the value of plaintiff's account against the company was *nil.* It is difficult to discover how such finding could stand in the light of the evidence or of the instruction. We think the court should have either set it aside or required remission of a sum commensurate to plaintiff's share of this asset.

Another error associated with that just discussed consisted in refusal of an instruction that the amount of this asset was not merely the face of the stock issued without consideration, but also interest thereon from date of its issue. If the stockholders were liable at all, they were liable as well for interest from the time when they ought to have paid the principal. *Laycock v. Parker,* 103 Wis. 161, 187. That time was, of course, when they received the unlawfully issued stock. *Jenkins v. Bradley,* 104 Wis. 540, 563. The interest from that time would have been so considerable a sum that the share apportionable to plaintiff's claim against the company would have approximated a thousand dollars. Instruction should have been given substantially as requested.

16. Specific error is assigned upon the refusal of the court to restrict plaintiff's recovery to five sixths of the damage caused to herself and Hopper, her partner, jointly by the alleged deceit. Upon the exact question raised, counsel cite no direct authority to guide us. Plaintiff claims recovery of the whole as survivor of two joint sufferers by a tort,— a right well recognized, and of which we should not doubt if there had existed any joint right of recovery up to the time of Hopper's death. But did any such right of action remain in him after the sale to plaintiff of his interest

in the debt due from the National Company? That was not, in terms, even an attempt to assign the unassignable tort cause of action. *John V. Farwell Co. v. Wolf*, 96 Wis. 10; *Lane v. Frawley*, 102 Wis. 373. So that we have not the question whether an attempted assignment of a nonassignable claim leaves any cause of action in the assignor. The question is very different. It is, in effect, whether, when one who has been defrauded into buying a credit, afterwards sells that credit for all it would have been worth if the false representations had been true, he has still a cause of action for deceit. The question would seem to answer itself. Deceit alone gives no right of action unless damage is suffered. *Potter v. Necedah L. Co.* 105 Wis. 25. As we have pointed out under No. 14, the difference in market value is not the measure of damage in the acquisition of debts. *Foster v. Taggart*, 54 Wis. 391. Surely, if a deceitfully sold promissory note was in fact paid by its maker, no cause of action in tort would exist, however valueless the note might have been. Why should its purchaser any more have a cause of action for damages if he had sold the note for its face value without recourse on himself? He would no more suffer damage in the latter case than in the former. The principle is suggested in *Barth v. Loeffelholtz*, 108 Wis. 562. There it was pointed out that one who had been defrauded into becoming a creditor had two entirely consistent causes of action, and might pursue either or both; that he might sue *ex contractu* and have judgment on his debt, and afterwards sue in tort and have another judgment for his damages *provided he had not obtained satisfaction;* that one satisfaction would discharge both rights of action. That would seem to be the situation here; for Hopper in his lifetime had received, according to the evidence, full value for his share of this claim against the National Company. After that he had no right of action either on the debt or for

·damages, and plaintiff might have sued alone for her own injury. That one of several joint sufferers by a tort may receive satisfaction of his share of the damage, and that thereupon the others may sue without him, but can recover only their own shares, is sustained by the highest of English authority. *Sedgworth v. Overend*, 7 Term, 279; *Bloxam v. Hubbard*, 5 East, 407. Approved in America in *Hart v. Fitzgerald*, 2 Mass. 509, 511; *Sherman v. Fall River I. W. Co.* 5 Allen, 213, 215; *Smith v. Aldrich*, 12 Allen, 553, 556; *Call v. Buttrick*, 4 Cush. 345, 350; *Lewis v. Lyman*, 22 Pick. 437, 444. It seems obvious that at the time of Hopper's death there existed no joint right of action in tort, and that plaintiff can now recover only her separate interest in the damage caused by defendant's deceit. Error was therefore committed in allowing recovery to the full value of the credit given, instead of only for five sixths thereof.

17. The judgment is further vigorously assailed as not supported by the verdict nor by any order of court, it having been entered by the clerk upon the filing of an order merely denying defendant's motion to set the verdict aside and for judgment. The order of the court in that connection is somewhat ambiguous, and perhaps did not warrant the clerk in entering the judgment. If, however, the judgment was warranted by the verdict, as the court apparently decided, no prejudicial error would result. We need not, however, discuss that question, since we have found reversal inevitable on other grounds. The situation, of course, will not repeat itself upon another trial.

In the same connection, however, is raised one question upon which we ought to speak; that is, the award of interest by the court without any finding of the jury other than the amount to which the plaintiff's firm was induced to give credit by the defendant's misrepresentations. The appellant contends that in all actions for recovery of unliquidated damages interest can only be recovered as damages and in

the discretion of the jury. The books contain many state-
ments generally to this effect. The greater· the antiquity
the more general is that view, until we reach an age when
interest as such received no recognition from the courts. It
was, at most, permitted to juries as a method of punishment
of a wrongdoer. In modern times interest has come to be
recognized as a legal right enjoyed by a claimant, not merely
as a mulct imposed on a defendant. *Laycock v. Parker*, 103
Wis. 161, 179. Treatment of interest as damages, and in
the discretion of the jury, is still maintained to some extent,
more in England than in America. In the latter, that view
is becoming more and more confined to classes of recovery
where the whole subject of damages, as measured by money,
rests in the discretion of the jury; such as for personal in-
juries, defamation, and the like, where, as it is said, the in-
jury has no real money value. Perley, Interest, 194. In
such cases the rule amounts to no more than that the lapse
of time may, in the judgment of the jury, have increased
the damages, and in estimating such increase they may use
legal rates of interest as a basis. On the other hand is that
class of cases where the damage is of a pecuniary.character,
measurable in money with reasonable certainty, as where
the conduct of the defendant has deprived the plaintiff of
money or of property of reasonably definite money value.
In that class of cases the trend of modern decision is to the
proposition that full compensation can be made only by re-
quiring reimbursement of the money value and the interest
such money would presumably have earned in the hands of
the party deprived of it. Interest is allowed as damages, it
is true, but as compensatory damages, measured according
to a certain rule of law which courts are bound to apply
and not to leave subject to the discretion of juries. With
this modern attitude this court has placed itself in entire
accord, after careful deliberation, in *J. I. Case P. Works v.*
*Niles & Scott Co.* 107 Wis. 9. That decision was reached

Shaw vs. Gilbert.

after full consideration of the contrary authorities, including the somewhat hasty remarks in *Hinckley v. Beckwith*, 13 Wis. 31, 37, and *Allen v. Murray*, 87 Wis. 41, 48, and overrules them so far as there is conflict. In accord with the views so adopted, there can be no doubt that one defrauded of money or valuable property is entitled to recover not only such money or value, but also interest from the date of the deprivation, both of them as legal elements of his damage. *John V. Farwell Co. v. Wolf*, 96 Wis. 10, 20. It follows that, when the necessary facts are ascertained, the court may and should apply the law. When the value of the property lost and the date are found by the jury, rendition of judgment, including the interest, follows as necessarily as for the value itself. In the record before us there is a lack of definiteness as to when plaintiff suffered her loss. That did not occur until the time arrived when, according to her contract with the National Company and in accord with the contemplated dealing, she was entitled to insist on payment. The same considerations which led us to overrule the assignments of error discussed as No. 14 indicate the necessity of more definite information as to when the actual deprivation of money was suffered by plaintiff. So far as appears, it may not have been until later than May 23, 1893.

We find no other questions raised which, by reason either of their general importance or their probable significance upon another trial, justify protracting this opinion by their discussion. Whether some other rulings on evidence or some refusals of requested instructions may have constituted technical error or may not is not very material, since for errors already defined we must reverse and order new trial. So far as such questions are not answered by the general views expressed they are deemed unnecessary of discussion.

*By the Court.*— Judgment reversed, and cause remanded for a new trial.

CASSODAY, C. J.   I concur in the reversal of the judgment in this case for errors mentioned in the opinion filed; but, assuming that the plaintiff has the right to recover, then I dissent from the proposition that the plaintiff, as surviving partner of the firm, cannot recover the full amount of damages sustained by the firm by reason of the tort committed by the defendant.   In my judgment, the defendant is not relieved from such liability by reason of the fact that the plaintiff purchased the interest of her partner in the assets and business of the firm.   This view is sustained, as I think, by the authorities cited by the plaintiff's counsel.

A motion by the appellant for a rehearing was submitted on the brief of *Frawley, Bundy & Wilcox*, attorneys, and *G. M. Woodward*, of counsel.

The motion was denied September 24, 1901.