ELDER and wife, Plaintiffs and Respondents, vs. SAGE, Defendant and Appellant: NEW LISBON STATE BANK, Impleaded Defendant and Respondent.

*May 3—June 6, 1950.*

For the appellant there was a brief by *Donovan, Gleiss, Goodman, Breitenfield & Gleiss* of Tomah, and oral argument by *Victor H. Breitenfield.*

*C. E. Macomber* of New Lisbon, for the respondents.

MARTIN, J. Since defendant-appellant has raised the question of fraud, it is necessary to detail many of the facts in this case.

The land upon which plaintiff Elder erected tourist cabins in which the defendant Sage installed heating and plumbing fixtures, was purchased by Elder for $900. He had only $600 of his own to pay toward the purchase price. In 1947, Elder negotiated a G. I. loan from the impleaded defendant, New Lisbon State Bank, in the amount of $10,000. The loan was to be repaid in instalments of $100 every three months commencing September 12, 1947. The specification for the G. I. loan contemplated that the $10,000 would provide for plumbing and heating.

The bank made no investigation to see whether the money was being used by the plaintiff for the intended purposes. Elder defaulted in the first three payments and then made four payments at one time in May, 1948, out of the principal of the loan. The amount of the loan was disbursed by the bank to Elder starting on October 13, 1947, and the final balance of $2,340 was disbursed May 19, 1948.

Elder made an application for a further loan in addition to the $10,000 on June 14, 1948, at which time he received a loan of $500 on a note with his mother's signature. Further application for an additional loan was made about June 16, 1948. At that time the bank knew that Sage had not been paid for his plumbing. On June 18, 1948, the bank had a reply from the Veterans Administration indicating that a further loan might not be approved. At that time in June, 1948, if Elder had had to pay all of his debts he would not have had sufficient assets to do so.

Sage had no knowledge of the above facts with the exception of information conveyed to him that Elder was obtaining a loan from the bank.

Sage, a plumbing and heating contractor, entered into an oral agreement with the plaintiff Elder in April, 1948, for the furnishing of plumbing fixtures and services in the tourist cabins. Elder agreed to pay Sage between the first and tenth of each month as the work progressed and that the account would be kept current.

Sage started work April 29, 1948. He received payments of $200 on May 1, 1948 (balance $135.55), $300 on June 11, 1948 (balance $331.29), $100 on June 14, 1948 (balance $259.82), and $25 on July 14, 1948 (balance $367.92). Throughout these delinquencies, Sage demanded payment.

Sage testified: Elder stated that he had made a $1,000 loan to a friend and would pay him when this was repaid; that he was having money transferred from a New York bank and when that was accomplished he would pay him; and later that he had $10,000 of his own money in the project and needed additional money and had negotiated a loan with the New Lisbon bank. In June, 1948, Sage's bookkeeper consulted a Mr. Gibson, cashier of the impleaded defendant, and informed him that Sage was doing the plumbing on Elder's premises and that Elder was delinquent in his payments. On July 3, 1948, Sage stopped at the bank and talked with Gibson and was told that the loan was approved. On July 14, 1948, he again discussed the matter with Mr. Gibson and was informed that the loan was approved but the guaranty was not back from Milwaukee, but Sage had nothing to worry about. He was also told that the job would have to be completed before he would get his money. He then stated that if Sage would complete the plumbing he would be paid. Before completing the plumbing, Elder wanted a heating plant and Sage told him that he would not furnish $1,000 worth of material until he got paid for the work and material

already furnished. Elder assured him that the money would be available if Sage furnished the heating equipment. About August 5, 1948, Sage checked with Mr. Gibson at the bank who informed him that they had to have the heating plant and that the work had to be completed before payment could be made. Thereafter as he continued to furnish materials and services, he had further contact with the bank and Mr. Gibson stated he should go ahead and do the work, not to worry, the money would be paid. There remained only the act of connecting up forty feet of pipe to complete the heating installation, which was done just prior to the deer season in 1948. On December 6, 1948, Sage telephoned Mr. Gibson from the Bank of Tomah and a cashier from that bank listened in on the conversation. The testimony of the cashier and Sage is that Gibson inquired whether the last forty feet of pipe had been installed and when informed that it had been, Mr. Gibson said "come down Friday and you will get your money." Sage went to the bank the following Friday but was informed that the bank had to make an inspection of the premises before they could pay out any money. On October 15, 1948, when Sage was installing the heating system, his attorney prepared and filed a lien for Sage and a copy of this lien was sent to the bank. Sage testified that he subsequently discussed filing the lien with Mr. Gibson and was told it would not have been necessary for him to do that because he would get the money.

When Sage failed to get his money he had his attorney telephone the bank. Mr. Clark, the attorney, testified the bank at that time inquired what Sage would take to release his lien and was told Sage would accept $1,500. Mr. Gibson told him that Sage should come to the bank and the matter would be worked out. On December 18, 1948, he and Sage went to the bank. On the way they stopped at the Elder premises. Elder and his wife were gone and the premises were to a great extent unlocked and exposed to the public as well as the elements. Some of the equipment had already

been damaged by freezing. In the conference with Gibson and Mr. Mortensen, the president of the bank, Mr. Mortensen stated that the bank was "turning thumbs down" and that they were not paying out any money. He and Sage were informed that they did not know where Elder was. When they told the bank officials the conditions at the premises, Mr. Mortensen stated that the bank would attend to it.

Sage testified that Elder owed him $2,184.15. On December 18, 1948, he removed such part of his equipment as could be removed without damage to the premises and after ascertaining that Elder could not be found. He was not able to remove any of the materials installed in the house, which was locked, nor was he able to remove any of the pipe and fittings imbedded in concrete in the floors and walls of the buildings. The value of the materials which could not be removed and which still remained on the premises was $1,094.15.

Shortly after the materials were removed, Elder commenced this replevin action. Sage and Clark testified that at a conference in the latter's office, Elder stated that it would not have been necessary to remove the materials and that Sage would have been paid. Sage stated that if Elder or the bank would make the money available he would reinstall all of the equipment without any charge. No offer was made to make the money available.

The appraiser for the Veterans Administration testified that the value of the Elder premises with all heating and plumbing installed was $10,000, which was the amount of the bank's mortgage, and without the installations, the value was $7,500.

The witnesses for the bank denied the representations to Sage. However, the question of whether there was fraud is for the jury even though the other party denies the conversations with the defrauded person. *Shaw v. Gilbert* (1901), 111 Wis. 165, 183, 86 N. W. 188.

The rule is well established that if the evidence is conflicting, or if the inferences to be drawn from the credible evidence

are doubtful and uncertain, and there is any credible evidence which under any reasonable view will support or admit of an inference either for or against the claim or contention of any party, then the rule that the proper inference to be drawn therefrom is a question for the jury should be firmly adhered to, and the court should not assume to answer such question either upon motion for nonsuit or direction of verdict, or by substituting another answer after the verdict is returned. *Schoenberg v. Berger* (1950), ante, p. 100, 42 N. W. (2d) 466.

The statement in the trial court's decision that Sage did not rely on the statement that "the money is here" is not borne out by the record, for the evidence discloses that Sage's financial condition was not such as to permit him to grant large credit.

The question of whether Sage relied upon the statements made to him by the New Lisbon State Bank and Elder and whether he was thereby induced to sell his materials and service was a question of fact for the jury. *Lee v. Burnham* (1892), 82 Wis. 209, 214, 52 N. W. 255.

It was held in *Schauer v. Bodenheimer* (1912), 150 Wis. 550, 556, 137 N. W. 785, that it was prejudicial error in such case to refuse to submit to the jury the question whether plaintiff relied upon the alleged false and fraudulent statements.

Evidence tending to show fraud or bad faith presents an issue of fact, the determination of which is within the province of the jury. 54 C. J., Replevin, p. 564, sec. 281.

The record in this case discloses that it was for the jury to say whether false and fraudulent representations were made and whether the defendant Sage relied thereon.

In defendant's second cause of action against the bank:

Defendant alleged the agreement between plaintiffs and himself as to furnishing of plumbing fixtures and services; that the impleaded defendant was financing the project upon which such fixtures and services were furnished and delivered

and plaintiffs had executed a real-estate mortgage in the amount of $10,000 to the impleaded defendant. That the plumbing fixtures and services furnished by defendant added material worth to the security given by plaintiffs to impleaded defendant. That it was intended by plaintiffs and impleaded defendant that a sufficient part of the funds loaned by the impleaded defendant should be used to pay defendant for merchandise and services so furnished. That when plaintiffs were unable to pay pursuant to their agreement the impleaded defendant by its duly authorized representatives promised and agreed that if defendant would continue to furnish merchandise and services to be installed upon plaintiffs' premises, the impleaded defendant would pay defendant therefor.

That pursuant to said promises by impleaded defendant, defendant duly furnished and installed services and merchandise upon plaintiffs' premises. That when defendant had furnished fixtures and services amounting to $2,700 he demanded payment but the impleaded defendant refused to pay and breached and rescinded the agreement entered into with this defendant. That defendant then took steps to minimize the damages and enforce his rights and removed some of said property. That there still remains on plaintiffs' premises fixtures and equipment worth $1,200 which enhances defendant's mortgage security. That impleaded defendant intends to foreclose its mortgage and asserts that it is entitled to said fixtures and equipment notwithstanding its breach of its agreement with defendant. Defendant demanded judgment for $1,200.

From the testimony previously set out, it appears that this cause of action is proper for determination by the trial court. See *Estate of Williams* (1939), 230 Wis. 344, 283 N. W. 805, where a well driller started to drill a well at the request of a mortgagor but prepared to abandon the work on learning that the mortgagor was financially irresponsible, and was induced to complete the well on the promise of the mortgagee that he would pay the reasonable value of the services and materials furnished, both prior and subsequent to the making of the promise, and the benefits from the well would accrue to the mortgagee because the equity of the mortgagor in the premises was of little or no value, the contract was not void

under the statute of frauds as a promise to answer for the debt of another.

One of the grounds stated in the impleaded defendant's motion for nonsuit was that a cross complaint is not proper in a replevin action and the trial court so held.

The counterclaim of Sage against Elder and his cross complaint against the bank are bound up with and a part of the subject matter of the replevin action. The property sought to be replevined was delivered and installed on Elder's premises upon which the bank held a mortgage, and the installation of the plumbing and heating augmented the value of their security. The specification for the G. I. loan contemplated that the $10,000 would provide for plumbing and heating. Without the installations, the value of the property was $7,500. It is one of the rules of the Veterans Administration that they want the job completed before they issue a certificate of guaranty and for that reason the bank would be interested in having the plumbing and heating completed. Defendant Sage claims, and we have set forth this evidence, that Elder and the bank made false and fraudulent representations which induced him to complete the job. His cause of action would be clearly connected with the subject of this action, and he is entitled to assert a counterclaim and cross complaint. Secs. 263.14 and 263.15, Stats. *De Groot v. Veldboom* (1918), 167 Wis. 107, 111, 166 N. W. 662.

We agree with the trial court that the defendant had parted with and did not reserve title to the property. Plaintiffs were entitled to possession. 33 Am. Jur., Liens, p. 419, sec. 2. The jury determined the value of the property taken by defendant to be $900, and the damages of the plaintiffs to be $150, or a total of $1,050. The plaintiffs are entitled to a credit of this amount against defendant's counterclaim which must be established on a new trial.

*By the Court.*—Judgments reversed, and cause remanded for a new trial in accordance with this opinion.