National Bank of Merrill vs. Illinois & Wisconsin Lumber Co.

THE NATIONAL BANK OF MERRILL, WISCONSIN, Respondent, vs. THE ILLINOIS & WISCONSIN LUMBER COMPANY, Appellant.

*November 2 — November 22, 1898.*

*Corporations: Paid-up stock: Fraud by promoters: Evidence: Representations as to financial condition: Hearsay: Instructions to jury.*

1. If stockholders, honestly and in good faith, put property instead of money into a corporation and receive stock therefor, the fact that such property may have been overvalued will not prevent the stock issued from being full-paid stock, even as against a creditor of such corporation; but if the property is fraudulently received at a valuation substantially in excess of its real value, for the purpose of creating apparently full-paid stock and imposing upon the business public, then the stock is not full paid as to creditors.

2. In an action to recover money loaned to a corporation before the same became due, on the ground that the loan was procured by false representations that the stock of such corporation was paid up and it was doing a good business, it appeared that the promoters of the corporation had purchased property for $20,000, paying nothing down, but giving a mortgage for the entire price, and had conveyed the same to the corporation in consideration of its issuing to them paid-up stock for $60,000 and assuming the mortgage. *Held*, that it was a question for the jury whether the stock so issued was full-paid stock, and a nonsuit was properly denied.

3. In an action by a bank to recover money loaned to a corporation, in part on the faith of statements made by the latter to commercial agencies as to its financial condition, such statements and the reports of such agencies embodying them are admissible in evidence.

4. Evidence of like statements made by the corporation, not to the directors of the bank, but to its cashier, and by him reported to them when the loan was applied for, is also admissible to show that they relied upon them, and is not objectionable as being hearsay.

5. Upon an issue as to the truth of a statement that a corporation was doing well and making money in 1895 and 1896, evidence that it made a voluntary assignment for the benefit of its creditors early in 1897, is admissible in connection with evidence that there had been no sudden change in its financial condition.

6. To refuse to give an instruction asked for, the substance of which had been fully embodied in the general charge, is not error.

7. A charge, which is correct in itself so far as it goes, cannot be held erroneous because of the omission of an instruction upon a point which might properly have been the subject of an instruction, but in relation to which none was asked.

APPEAL from a judgment of the circuit court for Waupaca county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

This is an action for money had and received. On the 26th of August, 1896, the defendant borrowed $5,000 of the plaintiff, and gave its note therefor, due November 3, 1896; and when this note fell due it was renewed by the giving of a new note due January 22, 1897. On the 11th of January, 1897, the plaintiff returned the note, and stated that the contract was rescinded on the ground of fraudulent representations in the procurement of the loan, and immediately commenced this action and attached the defendant's property. All fraud was denied by the defendant, and hence it claimed that the debt was not yet due.

Upon the trial the evidence showed that the defendant was an Illinois corporation formed early in March, 1892, with an authorized capital stock of $60,000; the intention of the corporators being to manufacture and sell lumber at Merrill, Wisconsin. The corporation was formed by W. W. Schultz and C. B. Flinn, of Chicago, and C. H. Werden, of Merrill. Prior to the formation of the corporation, and on the 17th of February, 1892, Schultz, Flinn, and Werden, acting together, bought a sawmill and planing-mill plant of the Wisconsin Valley Lumber Company, at Merrill, Wisconsin, for the agreed consideration of $20,000. They paid no money down, but contracted to pay $5,000 ninety days from date, and the remaining $15,000 in three equal annual instalments; the whole sum being secured by a mortgage upon the property. On the 11th of March, 1892, they deeded the mills thus bought and the real estate to the defendant corporation; and the corporation issued to them paid-up stock for $60,000, and assumed the mortgage of $20,000.

The new corporation proceeded to buy timber and operate the mill, and continued so to operate it for five seasons, beginning with the season of 1892, and manufacturing an average of 19,000,000 feet of lumber per year. The evidence tends to show that during the years 1892 and 1893 large profits were made, which amounted to more than $40,000 in March, 1894, at which time they increased the capital stock to $100,000, by capitalizing $40,000 of this surplus, and issuing shares to the stockholders proportionately therefor. The evidence further tends to show that in 1894 there was a profit of $205.13; in 1895 a loss of over $7,000, and in 1896 of about $35,000. In January, 1897, immediately after the commencement of this action, a voluntary assignment was made by the corporation.

The evidence shows that financial dealings between the corporation and the plaintiff bank began in 1893, at which time Mr. Werden, on behalf of the corporation, applied to the cashier of the plaintiff bank for a loan of $10,000, and also for further loans from time to time, and represented to the cashier that the corporation had a paid-up capital stock of $60,000, and was doing a good business. This representation was reported to the plaintiff's directors, and the loan applied for was made by the bank; and thereafter, from time to time, further loans were made, and in July, 1895, the loans amounted to $20,000. There were times when the loans were all paid up; and the loan represented by the sum in suit in the present action was made August 26, 1896, the previous loans having been all paid at that time. The evidence tended to show that in July, 1895, when the application for the loan of $20,000 was made, Schultz stated to the officers of the bank that the corporation had a paid-up capital of $100,000, and was doing a good business and making money; but this statement was denied by Schultz. In addition to this testimony, the evidence showed that a number of statements were made by the corporation to

National Bank of Merrill vs. Illinois & Wisconsin Lumber Co.

Dun's and Bradstreet's commercial agencies in 1892, and 1894, 1895, and 1896, as to its capital and assets, which represented the capital to be $60,000 fully paid prior to 1894, and $100,000 fully paid after that date, which statements were relied upon by the plaintiff as a basis of credit.   There was a large amount of evidence given tending to show that the sawmill and planing-mill property of the defendant was not worth more than $20,000 when it was purchased, and, on the other hand, there was considerable evidence tending to show that it was worth from $50,000 to $75,000. The representations made by Werden were not denied, and the evidence tended to show that they were not discovered to be untrue until the day before the attempted rescission.

The jury returned a verdict for the plaintiff for the full amount claimed and interest, and from judgment on the verdict the defendant appeals.

For the appellant there were briefs by *Ryan, Hurley & Jones,* and oral argument by *M. A. Hurley.*

For the respondent there was a brief signed by *Curtis, Reid & Smith,* of counsel, and oral argument by *George Curtis, Jr.*

WINSLOW, J.   The appellant makes three general contentions: (1) That the evidence does not sustain the verdict; (2) that the court erred in admitting evidence; and (3) that the court erred in its charge to the jury.

1. The gist of the action was fraud.   Unless the evidence showed that the loan was made in reliance upon materially false representations as to the capital and financial condition of the corporation, there could be no recovery, because the debt was not due; and hence the first and fundamental question is whether there was sufficient evidence tending to show such fraud, and to sustain a verdict to that effect.

The representation admittedly made by Werden to the plaintiff's cashier in March, 1893, when applying for a loan

and a line of credit at the plaintiff bank, was, in effect, that the defendant had a paid-up capital of $60,000, and was doing a good business.   The evidence is very full to the effect that this representation was reported to the discount committee of the bank, and was relied upon in making the first loan to the defendant in the spring of 1893, as well as in making the subsequent loans.   It appears that substantially the same statement was made by Schultz and Flinn to Dun's and Bradstreet's commercial agencies in 1892 and 1894, with some additional statements as to liabilities and assets, and that the directors of the plaintiff in making loans to the defendant also consulted and relied upon the reports of the commercial agencies.   The manner in which the $60,000 worth of capital stock was fully paid has been detailed in the statement of facts.   In brief, it was as follows: Schultz, Flinn, and Werden purchased a saw- and planing-mill, with adjoining real estate, at the nominal price of $20,000, and gave their notes for that sum, secured by a mortgage on the property.   At the same time they organized the defendant corporation in Illinois, with an authorized capital stock of $60,000.   Acting in their capacity as corporators and directtors of the corporation, they agreed with themselves in their individual capacity to purchase the saw- and planing-mill for $80,000, paying therefor by issuing $60,000 full-paid capital stock to themselves; the corporation assuming the $20,000 mortgage on the property.   Thus it is claimed that the corporate stock became fully paid; and it is said in support of this claim that the statute authorizes the issuance of stock for property estimated at its true value, as well as for money (R. S. 1878, sec. 1753), and that there was evidence to show that the saw- and planing-mill property, though bought for $20,000, was in fact worth $75,000 or $80,000.   This, of course, is true; and it is also true that if stockholders honestly and in good faith put property instead of money into a corporation, and receive stock therefor, the fact that the

property may have been overvalued will not prevent the stock issued from being full-paid stock, even as against a creditor of the corporation; but the creditor who is seeking a remedy against stockholders or the corporation itself on the ground that its supposed full-paid stock was not such in fact must go further, and show, not only that the property in consideration of which it was issued was inadequate, but that actual fraud was committed in making the payment for the stock. *Coit v. Gold Amalgamating Co.* 119 U. S. 343; *Whitehill v. Jacobs*, 75 Wis. 474. In other words, it must appear that the corporation and the stockholders fraudulently agreed that stock should be issued and property should be received therefor at a valuation substantially in excess of its real value for the very purpose of creating apparently full-paid stock, and falsely holding the same out to the world as such. A gross and obvious overvaluation of property would be strong evidence of such fraud. *Whitehill v. Jacobs, supra.*

Now, in the present case it may be that Schultz, Werden, and Flinn secured a rare bargain when they purchased the saw- and planing-mill plant in question; that the property which they purchased for $20,000 was in fact worth three or four times that sum; and it may be also that they honestly believed such to be the fact, and, so believing, in good faith received $60,000 par value of corporate stock for property for which they had simply given a promise to pay $20,000. If such were the facts, their stock was in fact fully paid, and the representation that the corporation had $60,000 of full-paid stock was true. On the other hand, there was ample evidence that the mills were grossly and obviously overvalued; and, as the authorities say, this is strong evidence of fraud in the transaction. If, therefore, the mill property was honestly and in good faith exchanged for the stock, the stock was full-paid stock, as to the world, even though the property was not equal to the par value of the stock. If, on the other hand, the property was fraudulently and substan-

tially overvalued for the purpose of imposing upon the business public, then the stock was not full-paid, within the meaning of the law. Upon this branch of the case the ultimate question for the jury was, Did the corporation have $60,000 of full-paid stock, or did it not? And there was certainly ample evidence in the very nature of the transaction itself and the disparity in the prices at which the mill was bought and sold, to sustain a negative answer to this question. The conclusion is that the motion for nonsuit was properly overruled, and that there was sufficient evidence to sustain the verdict.

2. The evidence as to the statements made by the defendant's officers to the commercial agencies with regard to the capital stock, assets, and financial condition of the defendant company in 1892 and 1894 was all objected to; and it is now argued that its admission, and the admission of the published ratings and reports made by the commercial agencies which embodied these statements, was erroneous. These statements all contained the same representation as to the paid-up capital stock of the concern as that made orally by Werden, and it was shown that they were consulted by the directors of the plaintiff bank, and relied upon, in part at least, in making the various loans to the defendant.

The commercial agency which gathers and circulates reports as to the financial standing of business houses is an institution now so well established, and its reports are so universally used, that no court or merchant can plead ignorance of its purpose or functions. When a merchant states to such an agency his financial condition, he knows it is for publication to the business world, and that such publication will probably be consulted when he applies to any business institution for credit. He makes his statement, therefore, knowing that it will probably be used as a basis of credit. Upon what ground can it be said that such a statement is not a representation made for the purpose of securing credit,

as fully as if made personally to each business house with which he has dealings? Of course, the statement may become too remote in time to justify reliance upon it, or it may perhaps show upon its face that it is not made for the purpose of inducing credit (*Macullar v. McKinley*, 99 N. Y. 353), or the evidence may show other circumstances which forbid the idea of any reliance having been in fact placed upon it (*Curtis Brothers & Co. v. Hoxie*, 88 Wis. 41). Doubtless, in order to afford a basis upon which to rest a verdict of fraud, it must appear that the merchant made the statement for the purpose of inducing credit; that it was substantially false, not merely erroneous in some particulars, because exact figures are not usually expected in such statements, but so materially false and misleading as to show wilful intent to deceive the business public; and it must be so proximately connected with the transaction in which the plaintiff claims he was deceived as to afford good ground for believing that it was intended to be relied upon with reference to that or similar transactions. It must also appear that the statement was such as to deceive and mislead an ordinarily prudent man, and that it was communicated to the plaintiff, and believed and relied upon by him in granting the credit. When there is sufficient testimony tending to prove these facts, no reason is perceived why a verdict of fraud may not be founded upon a representation made through the medium of a commercial agency as well as upon a representation made orally to the plaintiff. *Eaton, Cole & Burnham Co. v. Avery*, 83 N. Y. 31; *Genesee Co. Sav. Bank v. Michigan Barge Co.* 52 Mich. 164; *Furry v. O'Connor*, 1 Ind. App. 573.

The members of the discount committee of the plaintiff's board of directors were allowed to testify against objection as to what the cashier told them Werden had stated with regard to the capital stock of the company. This is said to be hearsay evidence. The claim is not tenable. It was nec-

essary for the plaintiff to show that its directors relied upon Werden's representations in extending the credit. These representations were not made to any of the directors personally, except the cashier. Hence it was necessary to show what representations the cashier reported to the other directors, in order to show that the representations were relied upon by them. The rule is so elementary that it needs no citation of authority.

The defendant company made a voluntary assignment for the benefit of its creditors January 20, 1897, and the plaintiff offered the same in evidence. It was received against objection, and its reception is now urged as error. We think it was properly received. There was evidence tending to show that there had been no sudden change in the financial condition of the defendant, and the assignment was evidence that it was hopelessly insolvent and had been for some time, thus tending to contradict the alleged representations of Schultz made in 1895 and 1896, that the institution was doing well and making money. There were sundry other objections made to testimony which was received, but we do not deem it necessary to discuss them specifically. It is sufficient to say that we have discovered no prejudicial error in any of the rulings upon testimony.

3. The defendant asked the following instruction, and it was refused: "If the jury shall find from the evidence that the plaintiff granted the credit forming the basis of its claim for recovery in this action upon any statement made on behalf of the defendant, and authorized by it, to either commercial agency, the plaintiff cannot recover by reason thereof in this action, unless the jury shall find that such statement is false and made for the purpose of procuring credit, and that the plaintiff relied upon such statement in granting such credit, and, further, that such statement was such as was calculated, under the circumstances, to deceive a prudent man; and, if such statement had no direct connection with

the transaction of granting the credit in question in this case, the plaintiff cannot recover by reason thereof, as indicated in this connection, unless the jury shall also find that such statement was wilfully and intentionally made for the purpose of obtaining credit." The court, however, gave the following instruction, which covers all the propositions asked by the defendant, in somewhat different language: " In order to entitle the plaintiff to recover in this action, that is, to legally justify its action in rescinding the said promissory note of November 23, 1896, and declaring the money for which it was given to be due and payable immediately, and sue for the same, as was done, it is incumbent upon the plaintiff, in the manner stated, to prove to your satisfaction that the defendant's said officers made the representations charged, or some of them, concerning the defendant's assets and financial responsibility; that the statements so in fact made were, in some material respects charged, false in fact when made, and were so made for the purpose of obtaining credit, as before explained; that they were such as would be liable to be believed to be true, and acted upon as such, by an ordinarily prudent and careful man in the situation of the party to whom they were made, namely, to the president and managing directors of the plaintiff bank; that the said president and directors did in fact believe them to be true, and did in fact believe and materially rely upon such statements as true, in accepting the said note of November 23, 1896, in place of and in renewal of the note for a similar amount which matured on that day, and which had been given for a ninety-day loan made on the previous August 26th." There was no error, therefore, in refusing to give the defendant's proposed instruction, when its entire substance had been already embodied in the general charge.

No other instructions were asked for by the defendant, nor does the brief call attention to any errors in the general charge, though many exceptions were taken to it; and here

we might perhaps close this opinion, having considered all the points made by the appellant which seem important enough to require special discussion, were it not for one consideration, now to be stated.

The charge of the court was quite long and full, but it omitted to state to the jury the principle enunciated under the first head in this opinion, namely, that, if the mill property was exchanged for the stock honestly and in good faith, then it was full-paid stock, but if the property was fraudulently and substantially overvalued, for the purpose of deceiving the business public into believing that the stock was full paid, then it was not full-paid stock, as to creditors, and the representation that it was full-paid would be false. No such instruction was asked or suggested. Doubtless it would have been given, if asked, because it was applicable to the case. The failure to give it was not directly raised by any exception that we can definitely point to, nor is the matter discussed in the brief, nor distinctly assigned as error. The court charged the jury fully as to what would constitute fraudulent representations for which the contract might be rescinded, in the terms just given in this opinion, and we can see no error in the general propositions there laid down. In the charge he does not refer to the representation as to capital stock separately, but treats all the alleged fraudulent and false representations together. As applied to the representation concerning the $60,000 of full-paid capital stock, the charge says, in substance, that if that representation was materially false in fact, and made for the purpose of securing credit, and was such as would naturally be relied on by a prudent man, and was in fact relied on and believed by the bank when it extended the credit, then the plaintiff could rescind the contract. These general propositions are all true, but the court did not add, nor was it asked to add, an explanation of what facts would make the stock *not* full-paid stock. There were sufficient facts in evidence, if be-

lieved by the jury, to justify this conclusion, but the guide was not given them by the charge. In the state of the record, we think the question is not raised. The general instructions which were given were all correct, the specific instruction which would have been helpful to the jury was not given, probably, because it was not asked, and there is no exception in the record which raises the question. Thus, the rule laid down in *Weisenberg v. Appleton*, 26 Wis. 56, seems to apply, namely: "The charge, being correct in itself so far as it went, cannot be held erroneous by reason of omitting to instruct upon a particular point which might properly have been the subject of an instruction, but in relation to which none was asked."

*By the Court.*— Judgment affirmed.