SCHROEDER, Respondent, vs. WISCONSIN CENTRAL RAILWAY
COMPANY, Appellant.

*February 5—February 24, 1903.*

*Railroads: Injury at street crossing: Contributory negligence: Court
and jury: Special verdict: Evidence: Immaterial errors: Un-
lawful speed: Statutes construed.*

1. Plaintiff was injured at a street crossing of defendant's railway
   by cars which had been standing on the track which he was
   crossing and were suddenly thrown back against him with
   great violence by a switch engine which at that moment, com-
   ing from a further track by a cross-over switch, struck the
   other end of the cars. He had looked when 150 feet from the
   track and had seen these cars, with no engine on the same
   track, and the switch engine on the further track. Again,
   when about eight feet from the track, he had stopped, looked
   in both directions, and listened, and then saw there was no
   engine on the track with the cars, and thought he heard the
   engine, then on the further track. Thenceforward the engine
   was out of his sight, behind the cars. Upon the evidence, show-
   ing these facts and others, it is *held* that plaintiff's contribu-
   tory negligence was not conclusively established.
2. Refusal to submit for special verdict the question whether
   plaintiff could have heard the engine coming if he had stopped
   and listened before reaching the track was proper, since such

question presented no issue, but merely an evidentiary and in-
conclusive fact, fully included in the question whether plaintiff
was guilty of contributory negligence.

3. Refusal to submit for special verdict the question whether
plaintiff was guilty of a *"slight* want of ordinary care, which
contributed to his injury," was not error, the question sub-
mitted being whether he was guilty of *any* want of ordinary
care, etc.; and, there having been no specific request, failure
to instruct the jury that a slight want of ordinary care would
require an affirmative answer to the question submitted was
not error, the jury being instructed, with some emphasis, that
*any* want would constitute negligence and require such an-
swer. *Jung v. Stevens Point*, 74 Wis. 547, distinguished and
limited.

4. The admission of evidence that about an hour before the acci-
dent the fireman was running the engine without the engineer,
was not a material error, it being obvious that it had no effect
upon any of the issues finally submitted.

5. Secs. 1809, 1809a, Stats. 1898, construed together, make it un-
lawful to run trains or engines faster than six miles an hour
in cities and villages until after having passed all the traveled
streets thereof, except that where gates are maintained as pro-
vided in sec. 1809a a speed of fifteen miles an hour is per-
mitted. In the absence of proof that such gates are main-
tained the six-mile limitation will be presumed to be appli-
cable.

6. In an action against a railway company for injuries received at
a street crossing, where the complaint alleged negligence in
running the engine at an "unlawful rate, to exceed six miles
an hour," and such statutory negligence was fully established
by the proof, it was not error prejudicial to the defendant to
submit to the jury the question whether the engine was run at
"an unreasonable and dangerous speed."

APPEAL from a judgment of the circuit court for Wood
county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

Action for personal injuries suffered by plaintiff at the in-
tersection of defendant's north main track with Center
avenue, in the city of Stevens Point, on Sunday, November
5, 1899. Evidence tended to show a situation, so far as it
can be described in words, as follows:

Center avenue, which lies some 400 feet east of defend-
ant's station, is crossed by two main tracks running east and

west, and fourteen feet apart between centers. West of Center avenue, these two main tracks constitute substantially all of defendant's railroad material to the case, except for a cross-over switch between them, to be hereafter mentioned. Commencing in Center avenue, and thence toward the east, there diverge from these two main tracks, like the sticks of a fan, a series of switches or side tracks, which again repeatedly subdivide, constituting a yard covering many acres, and containing a large number of tracks, so that just at the crossing in question is what may be termed the "throat of the yard," across which switch engines pass with great frequency in the process of moving about cars from one part of the yard to another, or in making up trains. About 140 feet west of the center of Center avenue, towards the station, is a cross-over switch connecting the north with the south main track, thus enabling cars or engines to pass from one to the other; its junction with the south track being 268 feet west of the street center.

.On the day in question there were standing four box cars upon the north main track, the easterly end thereof extending a few feet onto a switch there diverging northward from said track. The east end of these cars was about the center of Center avenue. The west end was about 145 feet westward, and extending a few feet west of the point where the cross-over switch commenced to diverge toward the south main track. The plaintiff, returning from church at about noon, went southward on the east side of Center avenue, intending to cross the tracks and go on further southward, to his residence. The four box cars above mentioned were so located that they obscured from a foot passenger the cross-over switch and any train which had entered thereon from the westward far enough to make its divergence from the south main track perceptible when such foot passenger was at any point nearer than about thirteen to fifteen feet north of the cars. As plaintiff went southward on Center avenue, and about 150

feet 'before reaching the cars, he looked and observed them, and observed the situation about them; saw that there was no train or engine upon the north track to the westward of them, but did observe a switch engine with some cars moving about on the south main track. He passed on, with no very definite further observation, though, of course, with his face directed toward the tracks, until he reached a point some fifteen to twenty feet north of the cars, just beyond which the sidewalk terminated, where he left the sidewalk, but passed on southward in the street toward the track. When about eight feet from the north rail of the track on which the cars stood, he stopped, looked in both directions, and listened. He could then see the north main track upon which the cars were situated, at least as far westward as the depot, about 400 feet away, and there was no engine or train there. He thinks he heard the puffing of an engine in that direction, but, if so, that engine was on the south main track, as he had already observed. Immediately south of the track on which the cars stood was the flagman, whose custom it was to make deterrent signals if there was danger in crossing. He made no signal, and plaintiff proceeded to cross the track about ten feet east of the east end of these cars, when, just as he was midway of the track, the flagman shouted to keep back, and at the same moment the cars were thrown against him with great violence, and he was thrown down and injured. The movement of the cars was occasioned by the fact that the switch engine which had previously been upon the south main track had at that moment passed therefrom up the cross-over switch and come in violent contact with these standing cars. It came at a speed of about twelve miles an hour, and with such violence as to throw the body of one of the cars off the trucks, and by its impact to drive these four cars a distance of some 140 feet. It also came without the ringing of the bell. At the time that plaintiff stepped off of the sidewalk into the street to go towards the crossing, as above stated, that switch engine,

having one car in front and east of it, had just backed up westward on the south track to a point beyond the junction of the cross-over switch with the south track, and might have been seen by plaintiff in that position. It either was then standing still, or just commencing its movement eastward. In either event, it could not have been perceived that it was turning onto the switch to cross from the south track to the one which plaintiff was about to cross; and it is practically established by all evidence that, before that fact could have been perceptible, plaintiff must have passed onward so near to the standing cars that they obscured the approaching engine from his sight.

The foregoing situation and narrative of events in many respects is uncontroverted, but in all respects has evidence at least tending to its support. The jury found by a special verdict of sixteen questions, that the defendant was chargeable with negligence of its employees in running the engine at an unreasonable and dangerous speed, and in failing to ring the bell, and in the flagman's failure to give any warning to prevent plaintiff from attempting to cross; that such negligence was the proximate cause of the plaintiff's injury; that plaintiff was not guilty of contributory negligence. Whereupon, after motions to change the answers to several of these questions and render judgment in favor of the defendant, the court entered judgment thereon in favor of the plaintiff for the amount of damages found, from which the defendant appeals.

For the appellant there was a brief by *Howard Morris* and *Thos. H. Gill,* and oral argument by *Mr. Gill.*

For the respondent there was a brief by *O'Connor, Hammel & Schmitz* and *Fred F. Groelle,* and oral argument by *Mr. Groelle* and *Mr. A. J. Schmitz.*

DODGE, J.   1. The most strenuous contention on appellant's part is that contributory negligence appears as matter

of law. Such contention has been the subject of considera-
tion in a multitude of crossing cases in this court, and while
recognizing that due care or negligence must be measured by
the surrounding circumstances and is ordinarily to be de-
duced as a fact therefrom, many decisions have declared that,
for the courts of this state, certain conduct is so clearly vari-
ant from due care that the law declares it negligence, and
courts should so hold without submitting the question to un-
certain arbitrament by the jury. It has been decided that in
approaching a railway crossing one must use his senses of
sight and hearing to ascertain whether there is any approach-
ing train, of which peril the mere existence of the track is a
continual warning; that the duty to look and listen exists at
every opportunity to render it effective, but especially at the
last opportunity before entering upon the peril; also that
courts will not deem credible the testimony of a plaintiff that
he did look and listen, but did not see or hear that which the
physical facts and circumstances demonstrate must have been
apparent. A few of the decided cases are *Nolan v. M., L. S.
& W. R. Co.* 91 Wis. 16, 25, 64 N. W. 319; *White v. C. &
N. W. R. Co.* 102 Wis. 489, 493, 78 N. W. 585; *Koester v.
C. & N. W. R. Co.* 106 Wis. 460, 464, 82 N. W. 295; *Tesch
v. M. E. R. & L. Co.* 108 Wis. 593, 84 N. W. 823; *Guhl v.
Whitcomb,* 109 Wis. 69, 85 N. W. 142; *Steber v. C. & N. W.
R. Co.* 115 Wis. 200, 91 N. W. 654.

Applying such rules, is the plaintiff, beyond controversy,
brought within their condemnation? It appears that he
looked when 150 feet away, and again when eight feet, from
the track. It does not appear very conclusively, either by
testimony or verdict, that he did not continue some measure
of observation between those points; but concede, *arguendo,*
that he did not, such observation in this case could not have
disclosed to him any danger, nor helped to save him from the
accident. It would, at most, have confirmed, what he al-
ready knew—that an engine was in motion upon the south

main track. It would not have disclosed anything in the movements of that engine to indicate probability of its being transposed onto the north track, even if he had known of the existence of the cross-over switch, which by no means conclusively appears. During all this time of approach, plaintiff could see, and, indeed, had previous knowledge, that when he got close to the crossing he would have the best and most extended view of the track on which these cars stood, both to east and west, and could then most effectively take those precautions, which ordinary care demanded, to ascertain whether engine or train was approaching. Certainly we cannot discover conduct, in the course of his approach toward the track, which is inconsistent with ordinary care. There is testimony that when he got close to the track (i. e., within seven or eight feet) he stopped and performed his duty to look and listen for the peril of which that track was a warning, namely, an engine moving thereon. Having a view of several hundred feet, and having assured himself of the absence of any such peril, he proceeded to cross. Where in all this is there lapse in any of the respects declared essential to ordinary care in any of the foregoing cases? Had he relied on his observation while passing along the sidewalk, and omitted to renew it when close to the track, he would have fallen within the criticism of *Nolan v. M., L. S. & W. R. Co., supra,* where one, after looking and seeing an engine was stationary, indulged in some conversation, and then stepped on the track without giving a final look, which would have disclosed the approach of the engine. Had there been anything to suggest to him the existence of the cross-over switch, and that the engine which he saw to be on the south track was likely to turn thereon and come to collision with the standing cars, it might have been his duty to stop far enough back to have an unobscured view of that curve, and to assure himself that the engine was so far away as to exclude all possible peril, but no such suggestion existed. It does not appear that he knew of the switch,

nor that, when he passed the point where the standing cars
intercepted. his view, the engine on the south track had com-
menced to swerve northward. Had the engine been moved
at only six miles an hour, it seems more than probable that
such swerving would have been apparent long enough before
the collision to have been seen by plaintiff before his line of
vision was obscured by the standing cars. But in fact at no
time when the engine was so on the switch was he in a posi-
tion so that the most vigilant exercise of sight or hearing
could discover it.

We have not dwelt on the presence and conduct of the flag-
man. The extent to which absence of customary signals of
danger may justify any relaxation of vigilance which would
be expected if no such warning were customary has received
antithetic discussion in *Rohde v. C. & N. W. R. Co.* 86 Wis.
309, 56 N. W. 872, and *White v. C. & N. W. R. Co.* 102 Wis.
494, 78 N. W. 587. We need not enlarge upon that subject,
as, independently of the flagman's tacit invitation to cross,
we are unable to say that plaintiff is conclusively shown to
have omitted any of the possible efforts to have informed him-
self of the presence of the danger from which he suffered.
The situation seems to fall within the principle of such cases
as *Langhoff v. M. & P. du C. R. Co.* 19 Wis. 489, and *Tesch
v. M. E. R. & L. Co.* 108 Wis. 593, 84 N. W. 823, to the
effect that one who diligently uses all his senses, and assures
himself of the absence of any peril discoverable thereby, is
not necessarily negligent in crossing a railway track, although
there may exist a hidden danger of which he has no knowl-
edge and cannot by observation inform himself.

2. Error is assigned upon refusal of the court to submit,
at request of the defendant, the question whether plaintiff
was guilty of a "slight want of ordinary care, which contrib-
uted," etc. The question submitted was whether he was
guilty of *any* want of ordinary care, etc. The form adopted

by the court was correct. It covered the whole field. If guilty of either a slight want of ordinary care, or more than a slight want, the question must be answered in the affirmative, while appellant's question might, by a technical juryman, be answered negatively if he believed the omission more than slight. This subject has been fully ruled against appellant. *Mauch v. Hartford,* 112 Wis. 40, 57, 87 N. W. 816. In this connection it is also urged, however, that it was error not to explain to the jury that a slight want of ordinary care would warrant and require an affirmative answer to the question in fact submitted. What the court did was to instruct, with some emphasis, that *any* want would constitute negligence and require affirmation. It is undoubtedly established by numerous decisions of this court that, when properly requested, the attention of the jury should be challenged by direct use of the word "slight" in this connection, and we need neither repeat nor question the reasons which have induced the adoption of such rule. *Otis v. Janesville,* 47 Wis. 422, 2 N. W. 783; *Hart v. Red Cedar,* 63 Wis. 634, 642, 24 N. W. 410; *Jung v. Stevens Point,* 74 Wis. 547, 43 N. W. 513; *Shaw v. Gilbert,* 111 Wis. 165, 188, 86 N. W. 188. It is disappointing that such reiteration of a rule fails to secure response to it from the trial court, whose duty it is to correctly guide the jury by full instructions, whether expressly requested or not, without regard to whether reversal is to be apprehended in absence of such request. Appellant made no request for any instruction on the point, but now urges that the request for submission of a question embodying the word "slight" is tantamount to a request for an instruction making use of it, on authority of *Jung v. Slevens Point, supra.* That case does not go quite to the extent claimed. It decides that the word "negligence," used in the special verdict in that case, is so ambiguous,—signifying, as it may, slight, ordinary, or gross negligence—that the court ought, of its own

motion, to limit and define it, and that such duty was so imperative that a mere suggestion from counsel was enough to make its omission reversible error, even in absence of a formally requested instruction. In the present case there was no such complete omission of duty—merely a failure to inform the jury that the word "any" was used in sufficiently comprehensive sense to include "slight" want of ordinary care, which must be obvious to any one carefully observant of the language. No rule is better or longer established in courts of error than that, generally, mere omissions to give certain instructions to juries will not constitute ground for reversal unless definite request therefor is made. *Lachner v. Salomon,* 9 Wis. 129, 134; *Karber v. Nellis,* 22 Wis. 215, 219; *Weisenberg v. Appleton,* 26 Wis. 56, 60; *Austin v. Moe,* 68 Wis. 458, 32 N. W. 760; *National Bank v. Illinois & W. L. Co.* 101 Wis. 247, 258, 77 N. W. 185; *Hacker v. Heiney,* 111 Wis. 313, 87 N. W. 249; *New Home S. M. Co. v. Simon,* 113 Wis. 267, 271, 89 N. W. 144. That rule is recognized, and the method of making the request defined, by statute in Wisconsin (sec. 2853, Stats. 1898), which, as construed, requires counsel to formulate in writing the exact words of the instruction he desires given. *Lyle v. McCormick H. M. Co.* 108 Wis. 82, 91, 84 N. W. 18, 51 L. R. A. 906; *Hacker v. Heiney,* 111 Wis. 313, 316, 87 N. W. 249. To that rule, except as stated in *Jung v. Stevens Point, supra,* hardly any exception has been made, save where it is deemed that an element essential to the cause of action is left undisposed of by a special verdict because no direct question upon it is submitted, and because the jury are not so instructed that they must have disposed of it in answering some ambiguous or uncertain question in the verdict, so framed that the issue might or might not be included therein. In such case it has been held sufficient for counsel to request that the issue be submitted, and error has been held well assigned, not because

the court failed to instruct, but because it failed to submit the issue, either by a direct question or by explicitly defining the ambiguous ones so as to include it. *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109, 74 N. W. 554; *Dugal v. Chippewa Falls,* 101 Wis. 533, 77 N. W. 878; *Crouse v. C. & N. W. R. Co.* 104 Wis. 473, 480, 80 N. W. 752. The case of *Jung v. Stevens Point,* 74 Wis. 547, 43 N. W. 513, goes somewhat beyond this principle, and further than any other in this court toward relaxation of the very ancient and salutary general rule above stated. In that respect it is an extreme case, and we are not willing to extend its authority beyond the situation there presented. We are not willing to hold it error that the court omitted to instruct the jury that "any want of ordinary care" includes a slight want thereof, in the absence of a specific request.

3. Appellant presents as error the fact that the court submitted to the jury, both by question and instruction, to find whether defendant ran its engine at "an unreasonable and dangerous speed," while the complaint only alleged negligence in running "at a high and unlawful rate, to exceed six miles an hour." He contends that this did not charge a speed negligent in itself, but merely one negligent because forbidden by statute, and so not negligence, within the case made by the pleadings. This construction of the complaint is very technical and narrow. We should hesitate to hold that it does not fairly notify defendant of the claim that the speed was negligently high, giving the pleading the liberal construction commanded by statute. It has been said that a negligent speed is unlawful speed, independently of statutory prohibition. *Wickham v. C. & N. W. R. Co.* 95 Wis. 23, 26, 69 N. W. 982. Waiving such considerations, however, of course the error is immaterial if twelve miles per hour is expressly prohibited, for the jury have found upon abundant, if not uncontroverted, evidence that such was the speed. The statutes

on the subject are as follows: Sec. 1809, Stats. 1898, provides:

"In all cities and villages . . . no train or locomotive shall go faster, until after having passed all the traveled streets thereof, than at the rate of six miles per hour."

Stevens Point was a city. Center avenue was a traveled street thereof, and had not been passed by the engine. The apparently inevitable conclusion is, however, sought to be avoided by reference to sec. 1809a, Stats. 1898, which provides:

"Any railroad corporation operating a railroad in this state and whose line of road extends through cities and villages shall not run its trains or locomotives faster than fifteen miles an hour until after having passed all the traveled streets thereof, and shall cause the engine bell to be rung before and while crossing any such streets: provided however, that gates shall first be placed and maintained upon such street crossings within cities and incorporated villages over which trains shall pass as the public authorities of any such city or village may direct."

These two sections are found together in the Revision of 1898, and it must be presumed that the legislature intended that both should have some effect. It could hardly be thought that the prohibition in sec. 1809 against exceeding six miles was intended to be wholly wiped out of existence by a mere prohibition against exceeding fifteen miles, contained in sec. 1809a. Nor can we consider any such absurd construction as possibly the mere words of the latter section suggest—as that the *limitation* of speed is to apply only where gates are put in, while it may be unlimited in absence of gates. Quite clearly, the two sections were intended to be read together; the latter qualifying the former. So considered, they are intelligible and reasonable. The first prescribes a general limitation of speed in cities and villages to six miles per hour. The latter makes exception where the railroad has put in gates in compliance with directions from the city, in which case fif-

teen miles per hour shall be the limit. Such being the force
of the statute, the situation in which the higher speed may be
maintained is an exception to the general rule, and the burden
rests on him who claims the exception to prove the facts war-
ranting it. The record is barren of any evidence tending to
show that the defendant has placed any gates at street cross-
ings in Stevens Point. Until that fact is shown, it must be
presumed to be governed by the six-mile limitation prescribed
by sec. 1809. Hence, upon the record before us, the fact of
statutory negligence is fully established, and the further
finding that the speed was unreasonable and dangerous is, at
worst, mere surplusage and not prejudicial error.

The court refused to submit, at defendant's request, the
question whether plaintiff could have heard the engine com-
ing east from the switch, had he stopped and listened before
reaching the track. This question, like some similar ones in
fact submitted, presented no issue—merely an evidentiary
and inconclusive fact, hardly disputed, fully included in the
inquiry whether he was guilty of contributory negligence,
and which the court might, without error, refuse, in the ex-
ercise of its discretion over the form of the verdict. Another
sufficient reason for its refusal is that the fact, if found,
would be inconclusive, if not immaterial. That he could hear
an engine which he had seen and knew to be on the south
track would hardly deter the ordinarily careful man from
crossing the north track, when he could and did see that was
clear for 400 feet or more. It would, at most, suggest the
precaution of further observation after he had passed the
standing cars, and before attempting to cross the south track.

Error is assigned on allowing a witness testifying to his
observation of the vicinity about an hour before the accident
to testify that the fireman was running the switch engine
without the engineer. It is obvious from the instructions
and the special verdict that this fact had no effect upon any
of the issues finally submitted to the jury, and could not have

been prejudicial, whether admissible or not, when offered in evidence.

The foregoing discussion sufficiently covers all the assignments of error on which appellant seems to rely. We find nothing which can warrant us in reversing the judgment.

*By the Court.*—Judgment affirmed.

