FREY and others, Respondents, vs. GEUDER, PAESCHKE & FREY COMPANY and others, Appellants.*

*March 4—June 3, 1958.*

* Motion for rehearing denied, with $25 costs, on November 6, 1958.

258

The cause was submitted for the appellants on the briefs of *Quarles, Herriott & Clemons,* attorneys, and *Maxwell H.*

*Herriott* and *Neal E. Madisen* of counsel, and for the respondents on the brief of *Harry Primakow,* attorney, and *Seymour Gimbel* of counsel, all of Milwaukee.

WINGERT, J.   This appeal presents three main questions:

1. Was the issuance of some of the 3,000 shares of stock improper by reason of failure to conform with the limitations placed upon the distribution of such stock by the resolution adopted by the shareholders of the parent company on December 7, 1936?

2. Was the issuance of some or all of the stock in question invalid because in violation of the prohibition in sec. 182.06, Stats. 1935 to 1943, against issuance of stock for consideration less than its par value?

3. Was the defendant subsidiary company barred by laches or estoppel from canceling any of such stock which was improperly or illegally issued?

In brief, our conclusions are that the first two questions must be answered in the affirmative and the third question in the negative.   Accordingly, the judgment must be reversed.

1. *Overissue of stock to executives.*   In our opinion the plan adopted by the subsidiary's directors on November 3, 1937, and the distributions of stock pursuant thereto, violated the restrictions imposed by the stockholders of the parent company in their December 7, 1937, resolution in several particulars, and the finding of the trial court that they were "reasonably and substantially in compliance with the mandate of the stockholders" is without adequate support in the record.

(a) *Disregard of losses.*   In 1940 stock was distributed to Messrs. Frey, Millmann, and Voss on the basis of the company's earnings in 1939, without allowance for the heavy loss suffered in 1938.   We think this treatment clearly violated the provision of the parent company's resolution that

the distributions of stock be related to *accumulated* net earnings. The basic resolution authorized issuance of the 3,000 shares to key executives "in accordance with a plan, based on annual earnings of the new corporation . . . it being specifically understood and agreed that no plan shall be adopted by the board of directors that will result in the officers and/or employees receiving such stock as extra compensation in excess of a total of 150 shares for each $50,000 of *accumulated* net earnings of the company."

Disregard of the 1938 loss in issuing stock on the basis of 1939 earnings nullifies the word "accumulated" and appears quite inconsistent with the purpose of the plan, to reward the executives in proportion to the extent to which the owners of the company have benefited from profits. Over the two-year period 1938–1939 the company's net profits were only some $16,000, and yet the executives were rewarded with 690 shares of stock, which at the ratio prescribed by the parent should not have been issued on less than $230,000 of adjusted earnings.

Plaintiffs attempt to justify the disregard of losses on the theory that "accumulated" meant that earnings were to be accumulated month by month for a full fiscal year, each year to be treated separately in disregard of previous losses; and there was testimony that the company's accountant, Passmore, gave that explanation to an inquiring stockholder at the meeting on December 7, 1936. The words and the sense of the resolution are too plain to bear that construction, however, and there is no showing that the parent's stockholders as a group intended any such result. Such an interpretation would have permitted issuance of the entire block of bonus stock over a period of alternate profit and loss years in which the aggregate losses exceeded aggregate profits and the parent company and its stockholders were worse off than at the beginning; and would have been an inducement to the officers to shift losses to one year and profits to another to

inflate their bonuses. An interpretation which would permit these results does not commend itself.

(b) *Adjustment for taxes.* The controlling resolution of December 7, 1936, provided that no plan should be adopted which would result in receipt of bonus stock in excess of a total of 150 shares for each $50,000 "of accumulated *net* earnings of the company *over and above normal state and federal taxes,* such net profits to be determined by outside certified public accountants."

The "plan" adopted by the subsidiary's directors on November 3, 1937, provided that in computing the earnings base for issuance of bonus stock,—

". . . the net profits of the company shall be determined each year after charging off interest, real-estate and personal property taxes, normal federal and state income taxes, capital stock taxes, depreciation, and all other items of expense which under good accounting practices should be charged off, but specifically not including unemployment insurance and old-age pension charges, excess-profits taxes, state dividend taxes, undivided-profit taxes, sales taxes, or other special taxes which the company may be required to pay under any present or future law, either federal or state, . . ."

Each distribution of stock was based upon a computation of "net income for stock bonus computation" by Frazer and Torbet, certified public accountants long retained by the company. In arriving at that figure, they took net income before income taxes, then added state and federal unemployment taxes and federal old-age-benefits excise taxes, and deducted federal and Wisconsin "normal" income taxes. The effect of this was to add back to net profits as shown in the annual audit reports, items such as state and federal unemployment compensation taxes, federal old-age-benefits (social security) taxes, various surtaxes, and excess-profits taxes. These are said not to have been "normal state and federal taxes."

The record contains some rather conflicting and inconclusive testimony by accountants as to what taxes should be considered normal, and the parties differ as to whether that term is used as a word of tax art or as meaning "ordinary." The trial court made no determination of the question, except as embodied in the finding that the plan of stock distribution "was reasonably and substantially in compliance with the mandate of the stockholders," and the remark in the accompanying opinion that "any variance which could be discovered by use of a microscope is out of perspective."

In a case like this, the stockholders' resolution imposing restrictions on the issuance of stock to officers as bonuses, thereby diluting the stockholders' interest in the company, is to be strictly construed, and in the absence of compelling considerations to the contrary, ambiguities should be resolved in favor of the stockholders, to whom the officers and directors owe a duty of the highest good faith. Likewise ambiguities in the resolution should be resolved in harmony with its overriding purpose, which was here quite plainly and naturally to reward key executives in proportion to benefits accruing to the owners of the company in terms of net profits.

Applying these principles, we think that with one exception the taxes in question were ordinary and normal taxes, and should not have been added back to net profits in computing the basis for stock distribution. Certainly the stockholders as ultimate owners of the company benefit only from net profits after taxes of all kinds. The resolution of December 7, 1936, was carefully drafted by a competent lawyer, and we think that if the taxes to be subtracted from earnings had been intended to be limited to the so-called "normal" income taxes as contrasted with surtaxes and unemployment and social-security taxes, a more-appropriate expression, such as "over and above state and federal normal income taxes" would have been used, instead of "over and above

normal state and federal taxes." On the other hand we consider that the federal excess-profits tax enacted by congress in 1940 as an emergency incident of a highly abnormal war which was not in progress nor imminent in 1936, was not a normal tax within the meaning of the resolution.

(c) *Accelerated issuance.* The governing stockholders' resolution provided that the plan for issuing bonus stock should be "based on annual earnings" and should not result in issue of stock "in excess of a total of *150 shares for each $50,000* of accumulated net earnings of the company." Actually the stock was issued annually at the rate of 15 shares for each $5,000 of adjusted earnings. For the year 1937, for example, when the net earnings as adjusted for stock bonus purposes were computed by the company's accountants at $120,292, 360 shares of the bonus stock were issued instead of the 300 which would have been permissible on the theory the stock could be issued only in units of 150 shares, and that the whole of $50,000 must be earned to permit such issuance. Thus the distribution of the stock was accelerated.

In our opinion the above-quoted terms of the stockholders' resolution required that earnings be dealt with in multiples of $50,000, and stock issued only in blocks of 150 shares; and that for bonus purposes, the earnings in any year in excess of a multiple of $50,000 were to be added to those of a subsequent year. The words "a total of 150 shares for each $50,000," are significantly different than an expression such as "at the rate of 150 shares per $50,000." Our conclusion on this point is supported by an interpretation given in August, 1937, by the attorney who drew the basic stockholders' resolution.

(d) *Remedy for overissue.* To the extent that shares were issued in violation of the restrictions imposed by the stockholders' resolution, they were issued in violation of the old company's pre-emptive right to subscribe to them, and hence were subject to cancellation, unless such action was

barred by laches or estoppel. *Luther v. C. J. Luther Co.* 118 Wis. 112, 125, 94 N. W. 69.

2. *Violation of sec. 182.06, Stats. 1935 to 1943.* That statute, as it existed for seventy-five years prior to its repeal in 1953, contained the following provision:

"No corporation shall issue any stock other than dividend stock, except in consideration of money or of labor or property estimated at its true money value, actually received by it, equal to the par value thereof, . . . and all stocks . . . issued contrary to the provisions of law . . . shall be void."

Were the shares now in question issued "in consideration of . . . labor . . . *estimated at its true money value,* actually received by" the corporation, equal to the par value of $100 per share? If not, then by express provision of the statute, the shares are void.

Under sec. 182.06, Stats., stock issued in violation of sec. 182.06 is void, *First Avenue Land Co. v. Parker,* 111 Wis. 1, 4, 86 N. W. 604, and it cannot be made effective by estoppel, id., pp. 6, 7. Thus where stock was issued as a bonus to an employee who was already under contract for services, on the understanding he could pay for it out of dividends, it was a void issue, a mere gratuity, and gave the employee no rights against the corporation. *L. J. Mueller Furnace Co. v. Holmes,* 175 Wis. 518, 525, 185 N. W. 641. The issue of stock at less than par value, or with an understanding that part of it is not to be paid for, has been characterized as fraudulent in law irrespective of intent, and notwithstanding that the stock is not worth par in terms of market value. *Whitewater T. & P. B. Mfg. Co. v. Johnson,* 171 Wis. 82, 84, 175 N. W. 786. A purchaser of original-issue stock from the corporation for less than par is a participant in an illegal transaction, and is not entitled to judicial aid to rescind the purchase on account of fraud. *Thronson v. Universal Mfg. Co.* 164 Wis. 44, 49, 159 N. W. 575.

The severity of the statute as thus construed is somewhat mitigated where stock is issued in exchange for property or services, by the words "labor or property *estimated* at its true money value." Latitude is thereby allowed for good-faith estimates. It has been held that where a corporation accepts property in full payment for stock, it cannot be heard to say that the stock is not paid for; but its creditors may so assert. *Whitehill v. Jacobs,* 75 Wis. 474, 482, 44 N. W. 630. A creditor attacking the transaction must show not only that the consideration was inadequate, but that actual fraud was committed in the valuation. "A gross and obvious over-valuation of property would be strong evidence of such fraud." *National Bank of Merrill v. Illinois & Wisconsin L. Co.* 101 Wis. 247, 252, 77 N. W. 185, *Whitehill v. Jacobs,* 75 Wis. 474, 481, 44 N. W. 630. The term "fraud" as thus used was doubtless meant in the sense of intentional or conscious overvaluation. See 11 Fletcher, Cyc. Corp. (perm. ed.), p. 515, sec. 5214.

In the present case the executives to whom bonus stock was issued received substantial though not extravagant salaries. Bonus stock could lawfully be issued to them only to the extent that the value of their services, reasonably estimated, exceeded their salaries. In the circumstances of this case, we consider that the subsidiary corporation, acting at the instance of the parent and on the ultimate behalf of the parent's stockholders, may, as might creditors, assert that the services for which the stock was issued were not worth its par value.

There is no direct evidence in the record relative to the value of the services of these executives. The trial court disposed of the matter without valuing the services, by stating in its opinion that the prospective recipients of the bonus stock had no obligation to serve the new corporation, that they had no employment contracts until 1939, and that "the consideration for the bonus was patently for the willingness

to render services by persons who were not previously bound to do so." The court made a finding of fact that all of the 3,000 shares were "properly and validly issued from time to time for a valuable consideration received by said corporation from the recipients."

. We do not think this approach adequately meets the question presented by sec. 182.06, Stats., for it ignores the actual value of the services. The services of an executive are of course very difficult to value, but that fact does not dispense with the statutory requirement, although it may well furnish a partial explanation of the repeal of the statute in 1953.

In the absence of evidence as to the value of the services rendered by the four executives, over and above their salaries, we must determine where the presumptions and the burden of proof lay. Plaintiffs were the parties seeking affirmative relief from the court; defendants were the ones asserting violation of the statute. Which had the burden of establishing the value of the services above the salaries paid for them, in relation to the par value of the stock?

Where a lawyer sued a corporation on a contract to compensate him for certain services by issuing stock to him, this court held the complaint not demurrable for failure to allege that the services were worth the par value of the stock; inadequacy of consideration being an affirmative defense. *Conway v. Marachowsky*, 262 Wis. 540, 547, 55 N. W. (2d) 909.

We have reached the conclusion that the defendants, who assert that the statute was violated, had the burden in the first instance of establishing that the services were overvalued, but that when they showed that stock was issued in excess of the amounts permissible under the basic resolution of the parent company's stockholders, the burden shifted to the plaintiffs to go forward with evidence that the subsidiary received commensurate value for the excess of stock over that properly issued.

When the parent's stockholders authorized the issuance of stock as extra compensation for services, they agreed in substance that each $50,000 of accumulated net earnings would evidence services on the part of the executives having an estimated value of $15,000 (the par value of 150 shares). In the absence of a showing to the contrary, we must assume that such estimate was *bona fide* and reasonable.

Defendants point out that when the bonus stock was actually issued, the subsidiary charged on its books only $1 per share to operating expenses and $99 per share to earned surplus, and that the recipients of the stock reported only $1 per share as income for income-tax purposes, although the stock had a book value of about $133 per share, and the net profits of the company attributable to common stock were $5.60 per share in 1937 and over $20 per share in each of the years 1939–1941. From this it is argued that the parties to the transaction themselves valued the services for which the stock was issued at only $1 per share. We cannot agree that the services were thereby evaluated. It seems more like an attempt to value the stock, although an unrealistic one in view of the book value and the company earnings, and to minimize the income taxes of the stock recipients at the expense of the company which they served.

For the reasons stated, we hold that the defendants have failed to meet their burden of showing that the services of the four executives were not fairly worth, in addition to their salaries, the par value of the shares which were properly issued to them in accordance with the limitations imposed by the basic stockholders' resolution, and that as to such shares no violation of sec. 182.06, Stats., has been established.

On the other hand, we think there is no presumption that the shares issued in excess of the permissible amount were issued for value received in terms of services, and that as to those shares the presumption was the contrary, and the bur-

den on the recipients and their transferees, the plaintiffs, to show that the services were worth more than the stockholders had authorized to be paid for them. This burden has not been met, since there is no evidence on the subject.

Therefore we must hold that the excess shares were issued in violation of sec. 182.06, Stats., and were void.

3. *Ratification, estoppel, and laches.* The trial court found as a fact that the issuance of the 3,000 shares of stock was ratified by the stockholders of the subsidiary company and held as a matter of law that the subsidiary was barred by laches and estoppel from challenging the validity of the stock distributions.

*Ratification.* The wrongfully issued stock was not validated by ratification. Being void by force of sec. 182.06, Stats., as a matter of public policy, the company's stockholders could not make it valid by ratification.

Even aside from the statute, we do not consider that there was an effective ratification. While the trial court found, on sufficient evidence, that the stock issues were ratified by the stockholders of the subsidiary company, that is not enough. All the stock of the subsidiary, except that issued to the key employees, was owned by the parent company, and was voted in favor of ratification; but since both companies had the same directors, and 56 per cent of the stock of the parent company was held by the families of recipients of the stock, the action of the directors in voting the parent company's stock for ratification should not bind nonparticipating minority stockholders of the parent company. There is no evidence that the minority were apprised of or knew what was going on. The directors owed a duty to them of the utmost good faith to comply with the provisions of the resolution of December 7, 1936. In the circumstances the blanket resolutions adopted at meetings of the parent's stockholders, approving "all of the *lawful* acts of the officers and directors

. . . including their action in representing this company at meetings of" the subsidiary were not effective ratifications of the overissues of bonus stock.

"Unless the approval by the shareholders be a specific rather than a blanket vote, after knowledge or disclosure not only of the adverse interest of the directors, but of all material facts bearing on the fairness of the particular transaction or necessary to an intelligent disposition of it, proof of a formal ratification by the shareholders' votes should have but little significance." Ballantine, Corporations (rev. ed.), p. 178, sec. 71.

*Estoppel.* We doubt that stock issued in violation of sec. 182.06, Stats., can be validated by estoppel, since the statute provides, as a declaration of public policy, that such stock shall be void. This court has stated that "estoppel cannot create capital stock which the law does not permit to exist." *First Avenue Land Co. v. Parker,* 111 Wis. 1, 6, 86 N. W. 604. Be that as it may, no estoppel has been shown here, because it was stipulated that all of the plaintiffs except Henry F. Millmann acquired their shares of the bonus stock without payment of any valuable consideration therefor, and there is no showing that Mr. Millmann or any of the other plaintiffs or their predecessors in title changed his position to his prejudice in reliance on the validity of the shares. Estoppel *in pais* is an equitable doctrine and generally does not operate against one unless his conduct has induced another to change his position to his prejudice. *Wisconsin Telephone Co. v. Lehmann,* 274 Wis. 331, 335, 80 N. W. (2d) 267; *Callaway v. Evanson,* 272 Wis. 251, 254, 75 N. W. (2d) 456. On this point plaintiffs had the burden of proof.

*Laches.* Neither can the plaintiffs prevail on the ground of laches, notwithstanding the lapse of fourteen years between issuance of the last of the bonus stock and the cancellation of the shares.

Defendants argue that the doctrine of laches is available only as a bar to affirmative relief, and that since it is the plaintiffs who are seeking affirmative relief from the court, they cannot invoke laches to bar rights asserted by defendants merely by way of defense. See 30 C. J. S., Equity, p. 524, sec. 113; 19 Am. Jur., Equity, p. 340, sec. 492. We need not go that far, however.

We have held that an essential element of the defense of laches is prejudice to the party asserting the defense in the event the action is maintained, and that the burden is on the party asserting laches to establish that he was prejudiced by the delay. *Estate of Seefeldt,* 1 Wis. (2d) 509, 516, 85 N. W. (2d) 500. In the present case, as in the one cited, "There is a complete want of any evidence of prejudice to the appellant [here the plaintiffs] by reason of such delay, and, therefore, one of the essential elements of laches is entirely lacking." (1 Wis. (2d) at p. 516.) No prejudice having been proved, we shall not presume any.

In this connection it should be noted that in this action no claim is made against the plaintiffs for the return of dividends received on the stock, which may have been spent, and hence, so far as now appears, the cancellation of the stock will operate only prospectively, restoring the respective interests of the stockholders to what they would have been had stock not been issued beyond the limitations of the basic resolution of December 7, 1936.

4. *Further proceedings.* Since we hold that some of the bonus stock was wrongfully issued, we shall remand the case to the trial court to determine how much of it falls in that category, and which shares, held by which of the plaintiffs, were properly canceled. Since the record suggests that the subsidiary company had substantial earnings in years following 1941, the court may determine whether earnings in those

later years operated to validate shares wrongfully issued for earlier years. We intimate no opinion on that question.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings consistent with this opinion.

FAIRCHILD, J., took no part.